# APPENDIX.

[The following case of Kottwitz v. W. B. Knox, and the representatives of A. M. & C. C. Alexander, deceased, was, by some oversight, omitted from its proper place in the reports. It should have appeared in the 32d volume, having been decided in the Austin term, 1869. At the same time another and similar case, in which George B. Torrey was appellant, and the same defendants were appellees, was decided by this court, and the rulings in this case of Kottwitz were applied to it. And in the subsequent case of Charles Lewis against the same defendants and appellees, reported in the present volume, page 608, it will be seen that the same principles and rulings are reasserted. As the case is an interesting and instructive one, and the rulings of more than ordinary importance, it is deemed proper to give a full report of it here.

The new rules of the Supreme Court, respecting admission to its bar, conclude the appendix, and are commended to the attention of gentlemen who contemplate applying for license to practice in the court.—REPORTER.]

## AUSTIN TERM, 1869.

## A. S. KOTTWITZ v. REPRESENTATIVES OF A. M. & C. C. ALEXANDER, DECEASED, AND ANOTHER.

1. The general principle is fully recognized that if any part of the entire consideration for a promise, or any part of an entire promise, be illegal, whether by statute or at common law, the whole contract is void; but the illegality must enter into the contract and form part of it.

2. An intention of one of the parties to an ostensibly legal contract, to do an illegal act by means of the contract, will not invalidate the contract

as against the other party ; nor, it seems, would *mere knowledge* by the latter party, of the illegal purpose of the former, be enough to invalidate the contract as to both. The intent sometimes becomes the pivotal point of civil as well as of criminal causes.

3. If it were conceded that the exportation of cotton from Texas to Mexico was illegal during the late civil war, it would not follow that debts contracted for teams and supplies used in such exportation could not be enforced. Nor would mere knowledge by the seller that such was the destined use of the teams and supplies, debar his recovery by suit. But otherwise, if he did any act in aid of the illegal purpose.

4. This court knows of no law which was violated by the exportation of cotton from Texas to Mexico during the late civil war. (There is no pretense of a violation of the blockade in this case.) The revenue laws of the United States were not necessarily violated or evaded by such exportation. Legislation was provided by the United States for the payment of the tax on cotton taken from the insurgent States to loyal ports. (See the opinion *in extenso* on these questions.)

5. Plaintiff alleged that in 1864 the defendants were engaged in carrying cotton out of Texas into Mexico, and became indebted to plaintiff for money loaned them to purchase teams, etc., for that purpose. By amended petition plaintiff alleged that defendants had a contract with the Military Board of the State of Texas, to bring in cotton cards with the proceeds of the cotton carried out. Defendants excepted to plaintiff's petitions, assigning various grounds of illegality in the loan. *Held*, that it was error to sustain the exceptions.

6. Suit was brought in G. county not only against an executrix who resided and was administering her testator's estate in that county, but also against another decedent's executors who resided in another county, and were administering their testator's estate in such other county. The two testators had been partners, and the suit was on a partnership liability. *Held*, that there was no misjoinder of parties defendant: and that in such a case the executors residing in the other county were not entitled to be sued in that, the county where they were administering their testator's estate.

7. Though the death of one partner ordinarily operates a dissolution of the partnership, yet it is competent for partners to stipulate that on the death of either of them, the survivor shall proceed to complete the partnership business; and liabilities incurred by the survivor, in conducting the partnership business after the death of his partner, are enforcible against the representatives of the latter, in like manner as though they had been incurred in his lifetime.

8. Statutes are to be construed agreeably to the dictates of common sense, and conformably to the intention of the Legislature.

9. Protest and notice of non-payment are not necessary to fix the liability of the drawer of a bill of exchange who knew, at the time he drew the bill, that he had no funds in the hands of the drawee.

APPEAL from Grayson. Tried below before the Hon. Hardin Hart.

Petition was filed July 4, 1866, by Kottwitz, alleging that in January, 1865, C. C. Alexander died, leaving a will, and that Roberts and others qualified as executors.

That in July, 1865, A. M. Alexander died, and in October, 1865, Josephine B. Alexander was appointed executrix.

That before and up to the death of C. C. Alexander he and said A. M. Alexander were partners under the firm name of A. M. & C. C. Alexander, at San Antonio, Texas.

That on the fifth of May, 1865, A. M. Alexander borrowed of plaintiff Kottwitz, at San Antonio, four thousand dollars in gold, and appropriated the same to the payment of freight bills and other indebtedness of the said firm of A. M. & C. C. Alexander, contracted and owing prior to the death of the said C. C. Alexander.

That on the fifth of June, 1865, A. M. Alexander executed a draft in the name of the firm of A. M. & C. C. Alexander, for $4000, payable to Messrs. Russell, Morrow & Co., at the request of plaintiff Kottwitz.

That afterwards, at the request and on the demand of Russell, Morrow & Co., plaintiff paid off and liquidated said draft with gold coin, whereby he became the holder and owner of said draft.

That on twenty-ninth of June, 1865, said draft, drawn on L. C. Alexander, was by his wife protested, he being dead and his estate insolvent.

That on the twenty-ninth of June, 1866, plaintiff presented said draft to John U. Frailey, one of the executors of C. C. Alexander,

by whom it was rejected; and on the thirtieth of June, 1866, presented the same to the defendant Roberts, another executor, and it was by him also rejected; that on the second of July, 1866, plaintiff presented the same to J. B. Alexander, executrix of A. M. Alexander, and she also rejected it.

Plaintiff asked for judgment for $4000 and interest.

The original petition having been excepted to, the plaintiff, on twenty-seventh of November, 1866, filed an amended petition, alleging, in substance, that for a long time previous to the death of C. C. Alexander, he and A. M. Alexander had been partners, engaged in buying and selling cotton, and had acquired a large amount (ten thousand bales), which, to bring profitable sales, had to be taken to Mexico, and that, in carrying out the business, many teams and hands were hired, and large outlay in money required, and that the cotton was in danger of being stolen or otherwise lost; and that the money ($4000 in gold) was obtained by A. M. Alexander of plaintiff, and used in defraying the expenses of the moving of the cotton from the interior of Texas *via* San Antonio to Mexico. That by the partnership contract the partnership as to the cotton enterprise continued to bind the firm and all parties concerned in said cotton matter. That the estate of A. M. Alexander is insolvent.

By the second amended petition, Knox is made a party defendant, and it is averred that plaintiff did not know of the Knox interest at the bringing of the suit. Appended to the second amended petition is a copy of the articles between the Alexanders and Knox, whereby it appears that Knox was admitted to one-third interest in a contract with the Military Board of Texas, for the exportation of cotton and the introduction of cotton cards.

To the petition and amendments many exceptions were filed, but those requiring attention were, first, that no diligence was shown by the holder of the draft to bind the drawers. Second, that the contract declared on was illegal, in aiding the violation

of the United States revenue law for tax on cotton and in aiding the rebellion by the exportation of cotton for cards; which illegality, it is insisted by the defendants, is patent on the contract made part of the second amended petition.

The demurrer was sustained; plaintiff declined to amend, and judgment final was rendered for the defendants, from which this appeal was taken.

*Bowers, Walker & Cullen*, for the appellant.—The appellant insists that the petition is sufficient in law.

I. The ownership of the draft is sufficiently averred. (Merlin v. Manning, 2 Texas, 351; Heard v. Lockett, 20 Texas, 163; Guest v. Rhine, 16 Texas, 549.)

II. The petition alleges want of funds in the hands of L. C. Alexander at the date of the draft, and also his death and insolvency.

Want of funds in the hands of drawee excuses demand and protest as means of diligence to bind the drawers. (Dallam, 585, Riker v. Freeman; 4 Texas, 499, Durrum v. Hendrick.)

In this case the court held that the plaintiff, having alleged in his petition absence of effects in hands of drawee, has shown sufficient excuse for not having used the diligence prescribed by the statute, and say : " Having averred every fact which it was necessary for him to aver, to entitle him to recover, his petition is sufficient." (See, also, 12 Texas, 120, Cole v. Wintercost; 16 Texas, 129, Insall v. Robson.)

The petition also alleges presentation to the widow of the drawee, and her refusal to accept, on the twenty-ninth of June, 1865. If, under the circumstances as alleged, demand was necessary, it has been alleged and shown, and under the statute (Paschal's Digest, article 321,) notice was not necessary. The act of Mrs. L. C. Alexander is *prima facie* evidence of demand and protest. (See 13 Texas, 257, Pridgen v. Cox.)

The case of Smith v. Hubert, at the Galveston term, 1868, and Hoffman v. Gage, and other cases decided at the Galveston term, 1869, are not applicable to the case at bar.

Plaintiff here alleges facts excusing all acts of diligence whatever. The cases would be authority, releasing the drawers of the bill in the absence of allegations of facts excusing demand, etc.

III. Is the contract shown by plaintiff in his pleadings, illegal?

It will be seen that this is an attempt to defeat the collection of a debt, neither illegal in its consideration, for the consideration is borrowed money—gold or silver coin; nor in the mode of payment, for it is payable in dollars.

In order to bind the estate of C. C. Alexander, who was dead at the date of the bill, in the name of the partnership, the plaintiff shows the subject matter of the business, its continuance after C. C. Alexander's death, the necessity for the funds, and its application to the use of the cotton enterprise.

In revealing these facts, has illegality been shown; and any connection between plaintiff and such illegality?

Appellant will not make an argument that illegal contracts may be enforced, or that contracts in fraud of the revenue laws of the United States, or in aid of the rebellion, are legal. Admitting these long established and elementary principles, he insists that his cause of action, as stated in his pleadings, does not come within the rule defining illegal contracts.

He claims payment for money loaned. He avers that both A. M. and the estate of C. C. Alexander, are bound for the debt. His part of the contract was not induced by any agreement or contract among the owners of the cotton as to its disposition. A. M. Alexander attempts to bind the firm, using its name in the draft, having authority to do so by the contract of partnership.

The money is alleged to have been obtained for, and used about the said partnership property, but the payment of the loan was not contingent upon the shipment of the cotton to Mexico, or upon any disposition of it.

The illegality, if it exists, must be in some one of the stipulations of the parties, either in the consideration, including all the motives leading to the promise, or in the promise itself. The application of this rule, too, must be restricted to the acts of the parties making the contract; for courts do not, in civil more than in criminal actions, condemn or affect with forfeitures any litigant for the acts of others, to which he is a stranger.

In construing the contract as set out in the petition, " All presumptions of law are in favor of the legality of a contract; and if it be reasonably susceptible of two meanings, one legal and the other not, that interpretation shall be put upon it which will support and give it operation. Illegality of consideration shall not be inferred." (Chitty on Contracts, 571.)

In examining the pleadings of the plaintiff, no allegation will be found showing any other, or additional, motive from plaintiff, or Russell, Morrow & Co., the payees of the draft, than the loan or advancement of the money, inducing the drawing of the draft. It was not the business of Russell, Morrow & Co. to determine the use to which the money should be applied. They had no promise of its particular application. No faith had been broken by its application to any other purpose; on obtaining the money by loan, it was theirs (the Alexanders'), to be used at their discretion.

Nor is their promise to repay the money tainted by anything; it is simply to pay absolutely the money, without reference to any funds, success, misfortune, or to any contingency whatever. " He is not asking to enforce any agreement adverse to the provisions of any act of Congress, or against public policy. He is not seeking payment for any illegal act." (See 2 Wallace, 81; 2 Phil. Ch. R., 801.)

But defendants urge that the use of the money about the cotton, affected the contract of its loan with any guilt of any person who had owned it, and with the criminality of the owners in its proposed shipment to Mexico. That, because the money was used in

paying for teams, teamsters, and protecting and marketing the cotton, therefore, the loan, although not stipulating for such use, was illegal. In short, that the fact of knowledge on the part of Russell, Morrow & Co. of its probable application in furtherance of an illegal cotton trade, should prevent recovery.

Conceding what does not appear upon the petition, that the " cotton enterprise " was illegal, and that Russell, Morrow & Co. knew it when they loaned the money, even then, it can be recovered.

The rule given by Kent as derived from authorities cited, does not affect plaintiff's case :

" If the contract grows immediately out of, or is connected with an illegal or immoral act, a court of justice will not enforce it. But if it be unconnected with the illegal act and founded on a new consideration, it may be enforced, although the illegal act was known to the party to whom the promise was made, and he was the contriver of the illegal act." (2 Kent, 466.)

This doctrine is fully sustained by the United States Supreme Court in Armstrong v. Toler, 11 Wheaton, 268. Chief Justice Marshall, after reviewing the authorities on the subject, approves the charge of the court below, given in the words above quoted.

We refer to the opinion of Chief Justice Marshall in Armstrong v. Toler, for discussion of many of the cases on this subject, and as illustrating a case of a new and legal contract made about or concerning property, the subject of illegal action by one at least, and probably both of the parties. The new contract was held not to be vitiated by the former acts, though illegal, of one or both of the parties, about the same subject matter. (11 Wheaton, 268, Armstrong v. Toler; 16 Texas, 361, Marshall v. Shelton, where authorities are discussed.)

That the illegality must inhere to the identical contract sought to be enforced, is further illustrated in a recent case in 1863,

in which Justice Miller (2 Wallace, 81,) after reviewing the authorities urged by counsel, holds that partition can be had of the proceeds of a business, recognized to be unlawful, in violation of an act of Congress, even where such act of Congress declares everything in violation to be " null and void to all intents whatever."

One of the parties had obtained possession of the proceeds of a business recognized as illegal (speculating in soldier's claims), and had obtained a transfer by fraud. Bill in equity to set aside the conveyance and for partition ; defense, the illegality of the business from which the assets arose. Held, that partition could be had, and cites with approval from Lord Cottenham's opinion in Sharp v. Taylor, 2 Phil., Ch. R., as follows :

" The plaintiff and defendant were partners in a vessel.  *    *  They undertook to violate the laws of both countries by having her falsely registered in Charleston, South Carolina, as owned by a resident citizen of that place. In this condition she made several trips which were profitable. Defendant refused to account with plaintiff for his share of the profits, or to acknowledge his interest in the ship. When plaintiff brought suit in chancery in England, the defendant set up the illegality of the traffic and the violation of the navigation laws of both governments as precluding the court from granting any relief."      *        *        *        *

" The case was decided by Lord Chancellor Cottenham, and from his opinion we make the following extracts : ' The answer to the objection appears to me to be this : That the plaintiff does not ask to enforce any agreement adverse to the provisions of the act • of Parliament. He is not seeking compensation and payment for an illegal voyage.

" ' That matter was disposed of when Taylor (the defendant) received the money, and plaintiff is only seeking payment for his share of the realized profits. As between the two, can this supposed evasion of the law be set up as a defense by one against the

otherwise clear title of the other? Can one of two partners possess himself of the property of the firm, and be permitted to retain it if he can show that in realizing it some provision or some act of Parliament was violated or neglected? The answer to this, as to the former case, will be that the transaction alleged to be illegal is completed and closed, and will not be in any manner affected by what the court is asked to do between the parties. * * The difference between enforcing illegal contracts and asserting title to money which has arisen from them is distinctly taken in Tenant v. Elliott, 1 Bos. & P., 3; and Farmer v. Russell, Id; Thompson v. Thompson, 7 Ves., 232.'" (2 Wallace, 78, Brooks v. Martin; 17 Howard, 232, McBlair v. Gibbs; Story on Con., 621, *et seq.*; 5th ed. Parsons on Con., vol. 1, 456; 16 Texas, 361, Marshall v. Shelton, and cases cited.)

Appellant was not interested in the cotton enterprise, and unless his right to recover is in some way derived through or based upon some contract for the unlawful use of the cotton, his right will not be affected by anything done in its exportation. His knowledge of its supposed unlawful destination, without any further act in aid than the mere unconditional loan of the money, would not affect his remedy for the money loaned.

The cotton enterprise is introduced into the petition to extend the responsibility to C. C. Alexander's executors. It is alleged that during his lifetime the partnership had become owners of a large quantity of cotton; that by agreement this partnership about the cotton was to extend until its sale, regardless of the death of either party. Such are the conditions cast upon the representatives of C. C. Alexander, upon his death. If the executors had deemed it for the advantage of the estate, they should have disclaimed the partnership, and put an end to it. This has not been done, and the partnership, by the pleadings, appears to have extended until the final disposition of the cotton, for the entire enterprise.

Is not plaintiff entitled to recover in either event, whether the loan was made to A. M. Alexander, as surviving partner, in his general right for the protection of the cotton, or as partner, under the terms of the partnership, with the heirs or executors of the deceased partner?

It is shown by cases cited (Brooks v. Martin and others) that assets of the partnership are a legal subject of partition, and an account of profits could be enforced. If so, and by one of the parties to the illegal contract out of which the fund arose, *a fortiori*, at suit of an innocent creditor, who loaned money for the benefit and protection of that fund.

But what informs the court that the acts of A. M. Alexander, after the death of C. C. Alexander, were illegal? Will the court infer illegality? It is never presumed; in the absence of proof all things are legal.

In Kreiss v. Seligman, 8 Barb. R., 439, a case for debt for merchandise, groceries, etc., defendant pleaded that the beer for which plaintiff seeks to recover " was sold by plaintiff to defendant with full knowledge that the latter intended to sell the same at retail without license, and in violation of the excise laws." Plaintiff demurred to the plea. The court considered the question, whether one who sells goods to another with knowledge that the vendee intends to convert them to an unlawful use, as spirituous liquors to be sold at retail without license, can maintain an action for the purchase money?

In the course of the discussion, and after reviewing many authorities, the court reaches the conclusion and defines the rule to be: " The doctrine established by the authorities to which I have referred and others, upon the subject, I hold to be this: That where a party who sells goods or advances money to another with knowledge of a design, on the part of the latter, to put the goods or money to an unlawful use, does any act whatever beyond the bare sale, etc., in aid or furtherance of the unlawful object, he

cannot recover; or if the illegal use of the goods or money enters into the contract and forms the motive or inducement in the mind. of the vendor to the sale or loan, he cannot recover." * * * " But I think it is not established, and will never be the settled law, that bare knowledge on the part of the vendor, that the vendee intended to put the goods to an illegal use, which intention may or may not be followed up, will vitiate the sale and deprive the party of all remedy for the purchase money. * * * It would be punishing a party for a wrong when no wrong may have been committed." The judge, Seldon, decided that the plea, alleging such knowledge, etc., is not supported by law, because " the illegal design does not enter into or form any part of the plaintiff's contract, nor has he done anything in aid of its accomplishment." (8 Barb., N. Y., R., 449; 1 Pars. on Contracts, 5 ed., 456, approving this case as giving the law.)

Illustrative of the rule as to the connection with the illegal object, see 26 Vermont, 190, Burk v. Abbee.

In this case, an interest in the proceeds of an unlawful sale of spirituous liquors was assigned. Held, that the assignee could not recover, although an express promise was shown. Held, however, if the money had been made by the sale, and the fund afterward drawn on, and draft accepted, the illegality of the business out of which the money was made could not defeat the action. on the draft, because such promise was not connected with illegal sale.

Appellees insist that any trading in, or moving cotton, was *ipso facto* illegal. This is in mistake as to the date of the internal revenue law prohibiting the moving of cotton before the tax was paid, and imposing penalties for such removal before payment of tax. At that date no United States law forbade the moving, etc. (See act of June 30, 1864, §§ 177 and 180.) The law contemplated the arrival of cotton from the insurrectionary States, and provided for the collection of the tax after its arrival. The law condemned the sale of articles in fraud of the revenue law.

The law prohibiting removal of cotton was enacted July 13, 1866.

But will the court judicially know that the cotton was for shipment beyond the State of Texas?

Will the court, without proof, hold that moving cotton from the interior of Texas, via "San Antonio to Mexico," meant an unlawful shipment beyond the State and to the "Republic of Mexico?"

In order to sustain the judgment below, it is necessary for the court to judicially know, and that, too, in order to affect the "cotton enterprise" with illegality, that "Mexico" meant the "Republic of Mexico," or that it meant some point without the State of Texas.

In Andrews v. Hoxie, 5 Texas, 183, Judge Wheeler delivered the opinion, and after citing authorities, refuses to know judicially that "New Orleans" is in Louisiana, or out of Texas.

In case cited, Kearny v. King, 18 Eng. C. L. R., it will be seen that the court refused to assume that Dublin was in Ireland.

So in Missouri, held by Supreme Court of that State, that the courts of that State will not judicially know that "New Orleans" is in Louisiana. Again, in 8 Texas, 206, Ellis v. Park, the Supreme Court re-affirm the decision in Andrews v. Hoxie, and held that "we cannot judicially know that 'St. Louis, Mo.,' is in the State of Missouri." They further say in the same case, "the contract being legal and valid here, must be taken to have been so where made, unless it be shown by the party impeaching its validity, that by the *lex loci* it was illegal and void."

May we not insist in this case, that it being legal to buy and sell, and trade in cotton in Texas, the party alleging illegality should prove that the cotton was moved beyond Texas, before the court will declare the dealing therein to be unlawful?

Nor as to defendant Knox is illegality shown in the petition The case of The State v. White & Childs, 25 Texas, Sup., cited by appellees, affords no aid in determining the meaning of the con-

tract between the Alexanders and Knox.   White & Childs set up
claim through the acts of the Legislature constituting and reorgan-
izing the military board, and the validity of such legislation was
directly at issue '

Chief Justice Chase held that all the acts of the Texas Legisla-
ture in aid of the rebellion were void.   They were then not laws,
nor will courts take judicial knowledge of them as such, nor of
acts done under them as public history.

Appellant does not urge that if illegality should be alleged by
plea and shown by proof, that such defense would not be full.   He
only asserts that no illegality is shown by his petition.

*Maxey & Binkley* and *S. A. Roberts*, for the appellees.—We
respectfully submit that the general demurrer and special excep-
tions of defendants to plaintiff's petition and amended petition
were well taken and properly sustained.

First.—The liability of defendants was not fixed in the mode
pointed out by law.   (Story on Bills, §§ 376, 377;  Story on
Promissory Notes, § 208;  Id., § 319, *et seq.*)

The draft has never yet been properly presented for acceptance
or payment;  and, without a notarial protest, the liability of de-
fendants is not fixed, and it is now too late.   (Smith v. Herbert,
opinion by Chief Justice Morrill, Galveston term, 1868;  Smith
v. Dunlap, Galveston term, 1869.)   It is manifest from the pe-
tition and amended petitions, that the purpose of this loan
(which is the basis of the action of plaintiff in the court below)
was to aid A. M. Alexander, surviving partner of A. M. & C. C.
Alexander, to transport cotton belonging to that (late) firm, by
wagons, from Texas to Mexico.   We respectfully insist that the
plaintiff shows that he has no standing in a court of justice.

First—The act of Congress, June 30, 1864, § 179, (Bright-
ly's Dig. Laws of the United States, volume 2, from 1857 to
1865, 245,) declares that " on cotton, upon which no duty has

been levied, collected or paid, and which is not exempted by law, a duty of two cents per pound, which shall be and remain a lien thereon until said duty shall have been paid, in the possession of any person or persons whomsoever."

By virtue of that act the United States acquired a mortgage on every lock of cotton in the United States, wheresoever situate, to secure the payment of this tax. Any evasion, therefore, of this law was in violation of the vested rights of the government, and any contract, made by any party contemplating its evasion with any one to aid this purpose, and who furnished money or other thing, for the express purpose of violating the law, has within it the sting of illegality and fraud of the law, and therefore no standing in a court of justice.

The pleadings unmistakably disclose that this was the object of the loan, and that it was not only known to the plaintiff to what use Alexander would put the money, but that he could not have moved the cotton without this money. At the date of this transaction, May 2, 1865, war existed between the United States and the State of Texas, with other Southern States. This was known to all men. It was physically impossible to have removed a bale of cotton at that time, from Texas, in any direction, without the violation of some law. The non-intercourse laws prevented its going to the States; the blockade by the Gulf, and the internal revenue laws by way of Mexico; for it is judicially known, as part of the history of the times, that every revenue officer had been forcibly driven from the Mexican border. This cotton could not legally leave the United States without passing through the hands of a collector, (§ 301, same law, Brightly's U. S. Digest, vol. 2, 274,) and there was no collector on the route designated in plaintiff's pleadings, nor any where else on the Rio Grande; and the fact that the revenue laws were so violated is evidenced by the petition and amended petitions. And if this contract aided in the evasion of

XXXIV—44

said laws, then it has no standing in a court of justice. (Id., § 303, p. 275.)

Again, the declared and well settled policy of the United States was, during the war, to so hedge in the State of Texas and other States in rebellion, by a cordon of laws and of power, as to absolutely cut off all commercial intercourse with the outer world, and thus prevent the use of the cotton, and other means of the South so locked up, for rebellious purposes. Any one, therefore, who willfully violated this public policy, did so at his peril; and any one who willfully aided in its violation did so at his peril; and no contract made in aid of such violation can have a standing in a court of justice. (Story on Conflict of Laws, § 244, p. 371, et seq.)

We come now to the last point. In the petition to make William B. Knox a party defendant, plaintiff set up that Knox was a silent partner of the Alexanders in that contract; that he did not know that Knox was so until after he filed his original petition, but he nowhere avers that he did not know that the Alexanders had such a contract. On the contrary, his whole pleadings show that he did know, and upon the principle that pleadings are most strongly construed against the pleader, it follows that if he did not know, he ought to have said so. Now, this contract between the Alexanders and Knox is filed by the plaintiff with his amended petition, bears date November 26, 1864, and recites a contract made by the Alexanders, "with the Military Board of the State of Texas, October 10, 1864, for the transporting and exporting of cotton to Mexico, and of importing of cotton cards for said military board." This military board was an illegal organization for rebellious purposes. Both these contracts were anterior to the loan sued on. Now, if Knox be a proper party at all, his liability on this contract would result from his interest in carrying out this contract of the Alexanders with the military board; and this contract, being utterly without legal standing, any contract or

liability created to carry out the same, with knowledge of the purpose in both contracting parties, is necessarily without a standing in a court of justice; and knowledge of the Alexander contract is manifest on the part of the plaintiff. What, then, was the character of the contract of the military board with the Alexanders? For a full answer to this question we quote from the opinion of the Supreme Court of the United States, in the case of "The State of Texas v. White & Childs." On page 609, supplement to 25th Texas Reports, we find as follows:

"That board, as we have seen, was organized, not for the defense of the State against a foreign invasion, or for protection against domestic violence, within the meaning of these words as used in the National Constitution, but for the purpose, under the name of defense, of levying war against the United States. This purpose was undoubtedly unlawful, for the acts which it contemplated are, within the express definition of the Constitution, treasonable."

MORRILL, C. J.—This is a suit on a draft for four thousand dollars. Exceptions to the cause of action were sustained. The appeal involves the propriety of the judgment of the court sustaining the exceptions.

There were petitions and amended petitions filed. The original petition, filed fourth of July, 1866, states the names and residence of the parties plaintiff and defendants, alleging the residence of one of the parties to be in the county in which the suit is instituted; that, previous to January, 1865, the testators of defendants were partners trading and doing business at San Antonio, and known by the firm name of A. M. & C. C. Alexander; the death of C. C. Alexander in January, 1865; the death of A. M. Alexander in July, 1865; the borrowing of four thousand dollars in gold from plaintiff by A. M. Alexander, in May, 1865, all of which was expended in the payment of the firm debts contracted previous to the death of C. C. Alexander; the execution, in con-

sideration of this loan, of a draft calling for four thousand dollars at five days sight, on L. C. Alexander, payable at the request of plaintiff to Russell, Morrow & Co.; the payment of this sum to Russell, Morrow & Co. by plaintiff; the non-payment of the draft; the presentation of it, duly sworn to as to its justness, to the representatives of both C. C. Alexander and A. M. Alexander, and a refusal of each to acknowledge its justness.

An amended petition, filed twenty-seventh of November, 1866, recapitulates the material allegations in the original petition, and also the agreement between the partners, " that if either of them should die before the cotton could be exported to Mexico, or before the enterprise was completed, the survivor should proceed to carry out the object of the partnership the same as though both were living;" and also states that at the time the draft was drawn the drawee was dead, and that the drawer had no funds in the hands of the drawee at the time of the execution of the draft; also, that the drawee was insolvent at and before his death, and that plaintiff is both the legal and equitable owner of the draft.

On the sixteenth of December, 1867, an amended petition was filed, stating that one Knox was a partner of the firm known as A. M. & C. C. Alexander, and appends to petition, as a part thereof, the articles of partnership, signed by all the parties. This agreement disclosed that the parties had formed an alliance with the Military Board of Texas, whereby the firm agreed to carry their cotton to Mexico, and bring to the Military Board cotton cards. Plaintiff alleges in this petition " that he did not know, at the beginning of the suit, that the Alexanders and Knox were partners."

The defendants filed ten exceptions to the plaintiff's several petitions, as follows :

First—That the cause of action in plaintiff's petition and amendments is based upon a contract made in violation of the laws of the United States, and especially against the revenue laws thereof;

and is therefore null and void, and can have no standing in a court of justice.

Second—Because the cause of action set forth in plaintiff's petition and amendments was on a contract for the purpose of procuring for the State of Texas, then in open rebellion against the laws and authority of the United States, arms and ammunition and materials for their manufacture, whereby the better to enable said State to resist, by armed rebellion, the laws and authority of the United States; wherefore they say the same can have no standing in a court of justice.

Third—Because the contract upon which plaintiff's pretended cause of action is based was made in violation of the laws of the United States, as well as of the laws of nations, in this, that it was for the exportation and importation of material and implements for the manufacture of army supplies, contraband of war; and is therefore entitled to no standing in a court of justice.

Fourth—Because the consideration of the draft upon which plaintiff sues, as alleged by his pleadings, was for money lent to A. M. & C. C. Alexander, the agents of the Military Board of the State of Texas, to enable said firm to purchase and bring in, from a foreign nation, military supplies, implements and material for their manufacture, the better to enable the State of Texas, one of the so-called Confederate States, then in open rebellion against the Government of the United States, to carry on war against the United States, alike contrary to public law and public policy, and therefore void.

Fifth—Because, long before the making of said draft or instrument upon which the suit is founded, that the pretended partnership, heretofore existing between A. M. & C. C. Alexander, was dissolved by the death of the said C. C. Alexander; and that the defendants, nor neither of them, can be made liable for the sum of money mentioned in the instrument sued on, or any part thereof.

Sixth—Because the defendants, the executors of C. C. Alexander, deceased, are improperly joined with the legal representatives of A. M. Alexander, deceased.

Seventh—Because it is not averred in said petition or amendments thereto that the said A. M. Alexander did not pay the money mentioned in said instrument.

Eighth—Because the executors of C. C. Alexander, deceased, are improperly sued without the county in which the administration of the estate of C. C. Alexander is opened.

Ninth—Because the instrument sued upon, being a negotiable bill, has never been protested for non-acceptance or non-payment, nor was suit instituted thereon at the first term of the district court, after the same became due, nor at the second term with sufficient showing why it was not sued upon at the first term of the district court.

Tenth—Because said instrument upon which suit is instituted is payable to the order of Russell, Morrow & Co., and has never been indorsed by them to this plaintiff.

The four causes of exception first named, being similar, may be considered together; and their tendency is to defeat the cause of action for illegality.

That it is a general rule that "if any part of the entire consideration for a promise, or any part of an entire promise, be illegal, whether by statute or at common law, the whole contract is void," has been often decided. (1 Parsons on Contracts, 456.)

But this illegality must enter into the contract and form a part of it. It does not follow, that because one of the parties to a contract, apparently legal in itself, intended by means thereof to do an illegal act, that the contract was illegal. "There must be an illegal intent of some kind; mere knowledge that an illegal use may or ever will be made of the thing seems not to be enough." (Id.)

The intention with which a party does an act stamps the act as

unlawful and criminal, or legal and innocent; and as in criminal so in civil cases, the intent becomes sometimes the pivotal point of a cause. (Paschal's Digest, articles 1651–3.)

Admitting that it was illegal to export cotton to Mexico, it does not follow that it is illegal to pay debts contracted in the purchase of teams and supplies for that purpose. It is alleged in the petition that the money received from the plaintiff was so appropriated.

But we may admit, further, that the plaintiff loaned the intestates of defendants the money, for the recovery of which this suit is brought, for the purpose of enabling them to take cotton to Mexico in 1864, and still, unless he did something more than this, if the conveyance of the cotton was illegal, nothing would be shown to avoid the recovery of the money.

In Kneiss v. Seligman, 8 Barb. N. Y. Reports, 449, after a thorough review of both English and American authorities on the points then under consideration, the court say: "The doctrine established by the authorities to which I have referred, and others on the subject, I hold to be this: that where a party who sells goods or advances money to another, with knowledge of a design on the part of the latter to put the goods or money to an unlawful use, *does any act whatever beyond the bare sale, etc.*, in aid or furtherance of the unlawful object, he cannot recover.

"Or if the illegal use to be made of the goods or money enters into the contract, and forms the motive or inducement in the mind of the vendor or lender to the sale or loan, then he cannot recover, provided the goods or money are actually used to carry out the contemplated design."

There is no pretense in the case before us that the plaintiff, in lending his money to the defendants' intestates, was actuated by any other than lawful and friendly motives.

We may assume to know, historically as well as from observation, that cotton was the main motive power in the finances of the rebellious government, and that those assuming official positions

acted as if it were their individual property, or the property of the Confederate States. That every bale that was exported beyond the power of this Confederate government was *pro tanto* a diminution of their resources; and, on the contrary, every bale that passed beyond the Confederate lines into other parts of the United States was, in the same proportion, to the advantage of the United States. Such were the extraordinary prices commanded by cotton during the last years of the rebellion, and such was the demand for it, that the President of the United States is known to have said, that an exchange for it of gunpowder and ball by the United States with the Confederates would be an advantage to the former.

We know of no law that would be violated by taking cotton to Mexico in 1864. It has been suggested that the United States required certain duties to be paid on cotton, and the exportation of it to Mexico was virtually defrauding the United States of its revenue. But this does not follow as a matter of course. The party defendants were not precluded from paying duties; and if the cotton was really exported, of which there is no allegation, and the duties were not paid, which is not alleged, and the defendants have conscientious scruples, the duties can still be paid. Before we can admit that the plaintiff is chargeable with any illegal acts and intentions in lending the money sued for, it must appear that the defendants actually used the money for an illegal object, and that the plaintiff was fully apprised of the illegal acts intended, and furnished the money for that purpose.

As to the statement that the contract with the Military Board to introduce in the State of Texas certain military supplies, it is a sufficient answer that the plaintiff's allegation in his petition is, that he was not aware of the contract with the Military Board till after the institution of the suit; and of course, on the exception, this statement must be regarded as true; and, whatever was intended by the defendant, cannot affect him.

The statutes of the United States, in force at the time of the

transaction, contemplated that cotton would be removed from the States in insurrection, and provided for the payment of duties after removal. The act of thirtieth of June, 1864, section 179, (2 Brightly's Digest, 274, § 301,) provides :

"Whenever any cotton, the product of the United States, shall arrive at any port of the United States, from any State in insurrection against the government, the assessor or assistant assessor shall immediately assess the taxes due thereon, and shall, without delay, return the same to the collector or deputy collector of said district; and the said collector or deputy collector shall demand of the owner, or other person having charge of said cotton, the tax imposed by this act and assessed thereon, unless evidence of previous payment of such tax shall be produced."

The sixth error assigned is that the defendants, the executors of C. C. Alexander, are improperly joined with the legal representatives of A. M. Alexander, deceased.

The petition states that the draft was executed by the firm composed of A. M. Alexander and C. C. Alexander, whose firm name was A. M. & C. C. Alexander. If either or both of the estates of the deceased are not liable on the draft, it can be shown in this action, and a judgment against one, and not against the other, will result in no injury to the one released. Besides, the rules of pleading, as found in any elementary treatise on this subject, as well as the act of the Legislature, article 1452, Paschal's Digest, require that all parties, liable upon the same cause of action, if within the jurisdiction of the court, especially if joint parties, not only may, but must, be joined in the same action. It would have been error to have brought separate suits.

The fifth cause assigned is that it appears that C. C. Alexander was dead when the draft was executed.

There being nothing in our statutes affecting the question of the dissolution of the partnership by death, we necessarily resort to the law, which is the rule of decision in such cases. (Article 973.)

By the common law of England "the death of one partner will operate as a dissolution of the partnership." (Story on Part., § 317.)

But although a dissolution of the partnership takes place, by law, upon the death of any one of the partners, this proposition must be understood with the limitation that by the articles of partnership, or other agreement between the parties, it is not otherwise stipu- lated by the parties. For it is entirely competent for the parties to vary this general result of law by an express agreement. (Id. § 319*a.*)

The allegation in the petition is "that it was agreed, by and between the Alexander partners, that if either of them should die before the cotton could be exported to Mexico, or before the enter- prise was completed, then, and in that case, the survivor should proceed to carry out the object of the partnership, the same as though both were living."

Admitting this to be true, it would seem that the court could not and did not sustain the demurrer upon the exception above stated.

The next exception (being the ninth in order) that we shall notice, is that the draft was not protested, and therefore the liabil- ity of the drawers was not fixed agreeably to article 232 of the Digest.

That laws are to be construed agreeably to the dictates of com- mon sense, and to carry out the intention of the Legislature, is not a subject of controversy.

Among the fundamental legal principles are, " *lex nil frustra facit, lex neminem cogit ad vana seu inutilia.*" (Broom's Legal Maxims, 249.)

It certainly would be both vain and useless to inform the draw- ers of a draft that the drawee had no funds to pay the draft, when they themselves knew it when it was drawn.

As the petition states, " that at the time said draft was drawn,

that the drawers and neither of them had any funds in the hands of L. C. Alexander (the drawee), whereby said draft could be paid, and were well aware of this fact when the same was drawn," we conceive a further notice of the fact by a notary public would be unnecessary.

The seventh and eighth exceptions are, if possible, more frivolous than the sixth just considered, and the articles 1423 and 1427, Paschal's Digest, will furnish sufficient answer.

We believe that the plaintiff has shown a good cause of action, and that if upon trial his allegations can be substantiated he will be entitled to a judgment.

There are a great many useless and irrelevant allegations in the petition, as well as in the answer, which serve, as it seems, to confuse both the parties engaged therein, and others.

The judgment is reversed and the cause remanded.

Reversed and remanded.