John Kirby McDONOUGH et al., Appellants,

v.

Pedro Fox ZAMORA, Appellee.

No. 13617.

Court of Civil Appeals of Texas.

San Antonio.

July 20, 1960.

Rehearing Denied Aug. 31, 1960.

motion for instructed verdict and West has appealed from that judgment. We, therefore, have two actions, the one by Zamora against McDonough which McDonough has appealed, and the one by West against Zamora which West has appealed.

### Zamora v. McDonough

McDonough's points urge that the trial court erred in rendering judgment against him, because (1) his 1954 checks for $24,000 and $40,000 were tainted with the illegality of gambling; (2) the court improperly excluded transcriptions of conversations in 1957 between West and Zamora's attorneys; (3) the court improperly admitted testimony that Zamora during 1953 cashed checks for McDonough which he paid, and (4) plaintiff's attorneys engaged in improper jury argument. By cross-assignment, Zamora complains of the trial court's order requiring him to remit $32,000 exemplary damages, which the jury had found.

Plaintiff, Zamora, obtained favorable findings on all issues necessary to the proof of his claim on the checks. The jury found that (1) McDonough signed and delivered to Zamora the check in the amount of $24,000, (2) upon McDonough's signing and delivering such checks, Zamora paid McDonough the sum of $24,000, (3) on January 18, 1954, McDonough signed and delivered to Zamora a check in the amount of $40,000, (4) at that time, Zamora paid McDonough the sum of $40,000, (5) at the time McDonough delivered the checks to Zamora, he then intended to stop payment on them, (6) and McDonough should be required to pay $32,000 as exemplary damages. On motion for new trial, the court ordered a remittitur of the punitive damages and rendered judgment for $64,000 and interest.

Defendant McDonough urged two defenses—that he executed the checks under duress and that they were for illegal transactions. The jury answered these defensive issues against McDonough. McDonough does not complain of the finding that the checks were not executed under duress.

---

Rosenfield, Berwald & Mittenthal, Strasburger, Price, Kelton, Miller & Martin, Royal H. Brin, Jr., Dallas, for appellants.

Edwards & Flannigan, Turner, White, Atwood, McLane & Francis, L. Ray Pearce, Dallas, for appellee.

POPE, Justice.

Pedro Fox Zamora sued John Kirby McDonough and recovered judgment for $64,000 actual damages, plus interest, for two checks executed by McDonough in January, 1954, on which McDonough stopped payment. Zamora also sued Charles D. West for aiding and abetting McDonough in defrauding him out of the $64,000, but that phase of the suit was abandoned. However, West cross-acted against Zamora for damages he claims he sustained as a result of an assault and battery by Zamora's agents. The trial court sustained Zamora's

On January 15, 1954, McDonough flew from New Orleans to Havana for a brief pleasure trip. When he arrived in Havana, instead of going directly to the Sevilla-Biltmore Hotel where he had a reservation, he went to the Tropicana Club to dine and see the late show. The Tropicana is an elaborate casino, owned by Zamora, Oscar Echemendia, and two others. McDonough said that he gambled and lost "as usual" but cashed no checks. After two and one-half hours he left the club in company with Oscar Echemendia whom he knew from former visits in Havana. They went to a cafe and then McDonough went to his hotel. He testified that the next night, Saturday, January 16, he returned to the Tropicana where he said he again gambled and lost. On Sunday night, January 17, according to McDonough, in company with another man, he visited the Sans Souci Night Club. He testified that he did not gamble, but while he was in the gaming room he was invited to the manager's office and was coerced into signing four or five large checks drawn on the First National Bank of Dallas. In the record, in addition to the two checks in suit, are four checks totalling $101,000 payable to cash, executed by McDonough on January 17, 1954. McDonough ordered payment stopped on all checks including the two involved in this suit.

The issue on illegality inquired whether Zamora's purpose in cashing the two checks was to provide McDonough with funds to gamble in the Tropicana Club, Zamora's establishment. The only matters preserved are whether there is evidence and sufficient evidence to support the issues as submitted.

Without attempting to state all of the evidence in this large record, but applying the correct rule, there was evidence, and the findings were not against the great weight of the evidence. Zamora testified that he knew McDonough from previous visits at the Tropicana. Other evidence showed that McDonough and Oscar Echemendia, one of Tropicana's owners, were good friends. Zamora testified that he saw McDonough on the night of January 15, 1954, when he was at Tropicana, even before he checked into the hotel. He testified several times during a full cross-examination, that on the afternoon of Saturday, January 16, McDonough phoned and asked him to come to the Sevilla-Biltmore Hotel to cash a check for him. Zamora discussed the matter with his partners and then went to the hotel. From the lobby he phoned McDonough to meet him in the lobby, which McDonough did, and there he delivered McDonough $24,000 in cash when McDonough handed him the check in that amount. He testified that he did the same thing on January 18, with respect to the additional $40,000. Where, how, or if the funds were spent is disputed. There was no discussion between Zamora and McDonough about gambling, using the funds for gambling at Tropicana, Sans Souci Night Club, or elsewhere. In fact, McDonough testified that he went to Sans Souci Night Club, and to its gambling room, on Sunday, January 17, and not to Tropicana.

McDonough pieces together fragments of Zamora's lengthy testimony as judicial admissions of fact which contradict the jury finding. McDonough relies upon statements by Zamora that he knew McDonough was well known all over the world as a gambler, that he did not know where McDonough lost his money, and that one of the reasons he gave him "facilities" was that he knew he was a big gambler and might come and play his place. However, Zamora also testified, "We don't take checks for gambling obligations. We cash you the check, give you the money, and you do with it whatever you want." He said he didn't care what McDonough did with the money. This evidence at most shows that Zamora hoped that McDonough would gamble at Tropicana with the funds, but the transaction was one of cashing a check and providing McDonough with funds which he could use as he wished.

Zamora's testimony shows only that he made scattered statements which might be inconsistent with other statements. The statements, however, are not the clear, de-

liberate, and unequivocal ones required to constitute a judicial admission. Instead there were explanations, modifications, and at most inconsistencies in his testimony. See Griffin v. Superior Insurance Co., Tex., 338 S.W.2d 415; United States Fidelity & Guaranty Co. v. Carr, Tex.Civ.App., 242 S.W.2d 224.

■ McDonough himself has provided strong support for the jury finding. His evidence was that he did not need funds from the cashed checks for his gambling, and that he used only his pocket money and Travelers Checks for his gambling.[1] While it is true that he offered this evidence in connection with his now-abandoned defense of duress, he stated the facts without limitation as he remembered them. McDonough is in the awkward position that in testifying about duress he helped defeat his other defense of illegality. From the evidence, the jury could have inferred that Zamora cashed the checks as a mere accommodation for a former friend and wealthy patron, or, as McDonough urged during the trial, that it was not for gambling at all, but if so that it was for gambling, not at Tropicana but at San Souci or elsewhere.

■■ Knowledge that money furnished "might be used in an illegal enterprise would not of itself, without other act in aid or in furtherance thereof, defeat the right to recover." Lewis v. Alexander, 51 Tex. 578; Shelton v. Marshall, 16 Tex. 344, 360; Kottwitz v. Alexander's Representatives, 34 Tex. 689; Lewis v. Alexander's Executors, 34 Tex. 608; Oliphant v. Markham, 79 Tex. 543, 15 S.W. 569; Perkins v. Nevill, Tex. Com.App., 58 S.W.2d 50; Cleveland v. Taylor, 49 Tex.Civ.App. 496, 108 S.W. 1037; 6 Williston on Contracts, § 1681. Certainly, it was not proved as a matter of law that Zamora, through Tropicana, was a participant in any illegality. Springer v. Sahara Casinos Co., Tex.Civ.App., 322 S.W. 2d 33; Seibert v. Sally, Tex.Civ.App., 238 S.W.2d 266; Sanger v. Futch, Tex.Civ. App., 208 S.W. 681; 38 C.J.S. Gaming § 26.

■ McDonough complains of the court's exclusion of a transcription of a telephone conversation between counsel for Zamora and Charles D. West on January 23, 1957, and a later transcription of a conference between several of Zamora's Cuban and American attorneys, West and McDonough's attorney. McDonough offered the transcriptions to show prior inconsistent statements. These discussions occurred three years after the events in Cuba, between persons who were not pres-

1. "Q. Mr. McDonough, did you use the $24,000.00 which was given to you by Mr. Pedro Fox Zamora on January 16, 1954, for gambling purposes at the Tropicana Casino? A. I did not.
"Q. Mr. McDonough, did you use any part of the proceeds of the check which has been introduced in evidence and identified as Plaintiff's Exhibit No. 7, the same being a check in the amount of $24,000.00, for gambling purposes at the Tropicana Casino? A. I did not.
"Q. Mr. McDonough, did you use all or any part of the proceeds of the check dated January 18, 1954 in the amount of $40,000.00 for gambling purposes at the Tropicana Casino? A. I did not.
"Q. Mr. McDonough, I want to understand you clearly, sir. Is it your evidence that any and all moneys which you may have lost at the Tropicana on January 16, 1954 were paid for you in either cash or American Express checks? A. That is correct.

"Q. All right. The gambling that you did and to the extent that you did gamble at the Tropicana and other places while in Cuba, both in '54 and '53, is it true or not, sir, that any losses were paid by pocket money, either traveler's checks or cash? A. Any losses that I incurred in Cuba were paid either in cash or traveler's checks.
"Q. Now, let me rephrase the question, Mr. McDonough. I want to be sure that you understand what I am asking you. In view of the fact that your gambling losses, if any, in January, 1954, were paid for by you in traveler's checks, is it not therefore a fact that the two checks which have been introduced in evidence and marked Plaintiff's Exhibits 6 and 7, one in the amount of $24,000.00 and one in the amount of $40,000.00, were not given as payment for gambling debts? A. They were not given for gambling debts."

·ent when the events sued upon occurred, and, as the trial judge stated, were "lawyer talk." They were not statements of the parties but relate to a statement of the claims and defenses of the lawyers and their ideas about the law. There were discussions of possible criminal charges in Cuba which would embarrass McDonough throughout Latin America. Included in the transcription is West's conversation with some unknown person who phoned during the conference. They discussed the recent invasion of Cuba from Mexico, a bombing in the Nacional Hotel, which killed scores of people, politics, the Cuban army, the murder of the Chief of Police and of students who had taken asylum in the Haitian Embassy in Cuba, and the fact that a man charged with the armed robbery of Aga Kahn was in prison in Cuba. They discussed Fidel Castro, a young lawyer, "wonderful boy," who was then loose in the hills of Oriente Province with a revolutionary army. One of the Cuban Attorneys reported that he was one of ten brothers, and their father recently died leaving $2,-800,000 in the care of Fidel. They discussed a lawsuit in New York, the lotteries in Cuba, American tourism, blackmaii and character assassination. Plaintiff offered this extensive transcription in gross, though it embraced hearsay and a mass of irrelevant matter. The court properly excluded the transcripts.

McDonough, by another point, says that the court improperly admitted evidence by Zamora that McDonough on a prior visit to Tropicana in 1953 cashed checks totalling $25,800 which were paid. The objection is that his testimony was based on hearsay, but in our opinion it only showed that Zamora was uncertain in his memory. The evidence related to a matter which occurred about six years before trial, and Zamora was not clear whether he personally handled the transaction or whether he obtained the information from his records at Tropicana which were not in court. But McDonough can not complain, for he independently developed the same testimony and offered in evidence a letter from Zamora's partner to McDonough, which reminded McDonough of the checks cashed in 1953 which he paid.

McDonough complains also that Zamora's counsel argued to the jury: "You have an opportunity to shout to the world what is meant by justice, you have an opportunity to demonstrate to the Latin world, where juries are inconceivable. They wouldn't have a jury." Upon objection, the court orally stated: "I think that is right." McDonough's counsel then asked that the court instruct the jury to disregard the argument and reprimand counsel. The court then stated, "Your statement is correct, but I will overrule the objection." In our opinion, the court stopped the argument and openly approved the objection, but did not give an instruction to disregard it. However, the jury heard the court disapprove of the argument and it was not again repeated.

McDonough objected to one other argument, that the trial court had instructed a verdict against West's claim for assault and battery. The argument was, "Does the court inquire of you about any of the nasty machinations of the mind on the other end of the table? What about the Mickey Spillane story? What about all of this business about being beaten up, where is it in the Court's charge? It's already been thrown out." McDonough objected and the court ruled "Sustained". McDonough then asked that the jury be instructed to disregard it, and the court stated, "I did". The court apparently believed that in sustaining the objection in the presence of the jury, and then by repeating a second time that he sustained the objection, as he did, that the jury knew not to consider the argument. While the rulings with respect to both arguments were not as clear as they might have been the jury knew that the objections were made and sustained, and that the court thereby disapproved the argument. The argument was stopped and not repeated. We regard a failure to in-

struct the jury to disregard the statements as harmless.

█ The court's ruling that McDonough should not argue that Zamora failed to produce certain witnesses to the check transaction was proper, for there was nothing to show that they were under Zamora's control, and they were in Cuba, outside the jurisdiction of the court. 41-B, Tex.Jur., Trial-Civil Cases, § 251. It follows, therefore, that the judgment against McDonough will stand.

By cross-assignment, Zamora claims that he was entitled to recover judgment for the $32,000 punitive damages which the jury found in his favor. The court properly ordered a remittitur. The fifth and sixth findings of the jury, stated at the beginning of this opinion, are the basis for Zamora's claim to punitive damages. Objections to the issues were made because there was no evidence that defendant intended to stop payment, and the great weight of the evidence is that McDonough did not intend to stop payment. On motion for new trial the court disregarded the two issues and ordered a remittitur of all punitive damages.

██ Punitive damages are not recoverable in actions for breach of ordinary commercial contracts, though the breach is brought about capriciously and with malice. A. L. Carter Lumber Co. v. Saide, 140 Tex. 523, 168 S.W.2d 629; Hooks v. Fitzenrieter, 76 Tex. 277, 13 S.W. 230; Houston & T. C. Ry. Co. v. Shirley, 54 Tex. 125; Phillips v. Wick, Tex.Civ.App., 288 S.W.2d 899; Holt v. Holt, Tex.Civ.App., 271 S.W. 2d 477; Alamo Boiler & Machine Works v. Phillips, Tex.Civ.App., 215 S.W.2d 933; Oklahoma Fire Ins. Co. v. Ross, Tex.Civ. App., 170 S.W. 1062; Cochran v. Hall, 5 Cir., 8 F.2d 984; 25 C.J.S. Damages § 120; 5 Corbin on Contracts, § 1077; Restatement, Contracts, § 343; contra, Etter v. Von Sternberg, Tex.Civ.App., 244 S.W.2d 321. To this rule there are certain exceptions, some of which are well recognized, and others of which are uncertain. International Printing, Pressmen and Assistants' Union of North America v. Smith, 145 Tex. 399, 198 S.W.2d 729, 735. First, punitive damages are available in an action for breach of promise to marry. See Houston & T. C . Ry. Co. v. Shirley, supra. Second, such damages are allowed against public service companies when they breach a duty they assume by contract. In these instances, there is usually a duty imposed by law, or there may be a tort independent of the contract. Southwestern Gas & Electric Co. v. Stanley, 123 Tex. 157, 70 S.W.2d 413; Gulf C. & S. F. Ry. Co. v. Levy, 59 Tex. .542; Southwestern Gas & Electric Co. v. Stanley, Tex.Civ.App., 45 S.W.2d 671; Southwestern Telegraph & Telephone Co. v. Luckett, 60 Tex.Civ.App. 117, 127 S.W. 856; 1 Sutherland, Damages, 3 (3rd ed.). Third, as expressed by Judge Pleasants in Southwestern Telegraph & Telephone Co. v. Luckett, 60 Tex.Civ.App. 117, 127 S.W. 856, 857: "The allegations upon which the ' * * * breach was committed by the defendant amounted to a tort for which an action would lie for exemplary damages, independently of any right to recover actual damages by reason of the breach of contract alone." In other words, one may not be limited to a contract measure of damages if he actually pleads and proves a tort which is in addition to or coincident with a contract breach. It has been said that punitive damages are permitted when a breach is accompanied by "willful acts of violence, malicious or oppressive conduct." National Finance Co. v. Abernathy, Tex. Civ.App., 66 S.W.2d 358, 359; Morgan v. Steinberg, Tex.Civ.App., 23 S.W.2d 527. However, it is suggested that those descriptive words may be symptoms of an independent tort, and that there must be something more than a malicious and oppressive breach of contract, for even an intentional breach of a contract is not punishable by punitive damages. Carter Lumber Co. v. Saide, 140 Tex. 523, 168 S.W.2d 629; Houston & T. C. Ry. Co. v. Shirley, 54 Tex. 125; Holt v. Holt, Tex.Civ.App., 271 S.W. 2d 477.

■ It is in this third group of cases that we confront problems of classification. This is so because there is no precise line which separates contract from tort cases. "There is no exact line; instead, there is a zone of overlapping. Many cases can be classified in either field * * *." 5 Corbin, Contracts, § 1077. International Printing Pressmen and Assistants' Union of North America v. Smith, 145 Tex. 399, 198 S.W. 2d 729, 735. In applying the rules, Texas is said to have gone beyond most jurisdictions. 70 Harv.L.Rev. 532. It is believed, however, that the cases which apply the correct rule are those in which punitive damages have been allowed if and only if, a distinct tort is alleged and proved, independent of the contract action. A. L. Carter Lumber Co. v. Saide, supra. "A tort may grow out of, make a part of, or be coincident with, a contract. So the same state of facts between the same parties, may admit of an action ex contractu or ex delicto." Shirley v. Waco Tap R. Co., 78 Tex. 131, 10 S.W. 543, 549. However, independent tort is discoverable in most of the cases permitting punitive damages. Hence, in Shirley y. Waco Tap R. Co., supra, and Gordon v. Jones, 27 Tex. 620, there was a conversion of property. In Graham v. Roder, 5 Tex. 141, the "gist" of the action was fraud and deceit. In National Finance Co. v. Fregia, Tex.Civ.App., 78 S.W.2d 1081, there was a conversion of a vehicle. Accord, Hankey v. Employers' Casualty Co., Tex.Civ.App., 176 S.W.2d 357; Wright Titus, Inc. v. Swafford, Tex.Civ.App., 133 S.W.2d 287; National Finance Co. v. Abernathy, Tex.Civ.App., 66 S.W.2d 358, 359. In other cases, a fraud was alleged and proved. Mossop v. Zapp, Tex.Civ.App., 189 S.W. 979; Western Cottage Piano & Organ Co. v. Anderson, 45 Tex.Civ.App. 513, 101 S. W. 1061.

Briggs v. Rodriguez, Tex.Civ.App., 236 S.W.2d 510, called upon this Court to classify an action which only by legal fiction is a contract, such as an action for money had and received. We treated it as a tort action containing the elements of fraud and malice and permitted punitive damages. Accord, Ward v. Taggart, 51 Cal.2d 736, 336 P.2d 534; 30 Tex.Law Rev. 371. The Briggs case collects numerous other authorities wherein punitive damages were permitted in cases where the pleadings and proof showed fraud.

■ The instant case was a suit to enforce payment upon two checks. The finding which Zamora relies upon to support punitive damages is the single finding that "at the time he gave the checks in January, 1954, he then intended to stop payment thereon." Actions upon negotiable instruments are contract actions. 10 C.J.S. Bills and Notes § 525. Damages on such actions do not include punitive damages. 11 C.J.S. Bills and Notes § 727. The outrage at dealing in "hot checks" may prompt one to regard such actions as supporting punitive damages, but "exemplary damages cannot be recovered for the mere violation of a statute, whether it be one carrying a criminal penalty or not." Jones v. Ross, 141 Tex. 415, 173 S.W.2d 1022, 1024. One who cashes a check with a preconceived intent to dishonor it, is not unlike one who buys an automobile, groceries, a farm, a business, or any other merchandise, with no intent to make payments. In those cases, compensation upon the contract is regarded as adequate compensation. A diligent search inside and outside this jurisdiction has produced so few precedents involving punitive damages in actions upon dishonored checks that we are inclined to the view that at this late date, we would be revising the law instead of following it if we sanction punitive damages in an action to enforce "hot checks." An action to enforce and recover upon a dishonored check is not an action upon a fictitious contract. Briggs v. Rodriguez, Tex.Civ.App., 236 S.W.2d 510, 515.

■ In this case, the issue was submitted and the case was tried upon a theory of enforcing express contracts evidenced by negotiable instruments. International Printing Pressmen and Assistants Union

of North America v. Smith, 145 Tex. 399, 198 S.W.2d 729, 735–737, 742. Such a suit upon the contract is not a basis for punitive damages as the trial court correctly ruled. Minick v. Associates Inv. Co., 71 App.D.C. 367, 110 F.2d 267. Some of the language in Archer v. Ross, Tex.Civ.App., 262 S.W.2d 213, appears to be contrary to our decision, but in that case the plaintiff alleged a fraud action in the purchase of cattle rather than an action for non-payment of the drafts involved. Issues submitted to the jury show that it was a fraud case, and the dishonored draft was merely one of the facts incident to the fraud. Here, however, the action is brought to enforce collection on the checks, not in tort. The court properly denied judgment for punitive damages.

### West v. Zamora et al.

Charles D. West cross-acted for damages against Pedro Fox Zamora, and Tropicana Night Club, a partnership composed of Zamora, Oscar Echemendia, Alberto Ardura and Marton Zamora. The suit was for personal injuries suffered by West by reason of an assault and battery upon him by four men outside of Havana, Cuba. The court instructed the verdict against West because of his failure to connect the beating with the defendants or their agents.

McDonough, while in Havana phoned West in Dallas and told him that he was under surveillance and unable to leave Cuba. West, his employee, promptly flew to Cuba.

McDonough had tickets to fly back to the United States. West cancelled them but bought other tickets for McDonough to leave Cuba on that day at 2:30 p. m. on Delta Airlines. McDonough, without baggage, took a cab for the airport. A second cab carried the luggage. West, while the two cabs were on the way to the airport, became the sacrificial lamb and engaged Norman Rothman in conversation in the lobby of the hotel. He was the manager of the Sans Souci Night Club and was angry about McDonough's failure to honor some $101,000 worth of checks.[2] After time had elapsed for McDonough to make his 2:30 flight, West took a third cab and proceeded to the airport. A car forced the cab to the side and four men then beat West. He did not know any of them. West, however, proceeded to the airport and flew on to Dallas. He was later confined in the hospital for extensive treatment.

The theory upon which West seeks to hold Zamora and the Tropicana and its owners is not clear. There is no direct evidence which would connect defendants with the four men who beat West. There is evidence that McDonough was under surveillance, but this was, as appears from West's brief, by "unknown persons." See, Crosby v. Stevens, Tex.Civ.App., 184 S.W. 705. The credit manager for Tropicana was at the airport and was angry when McDonough left the city. He phoned West on January 25, 1954, from Havana and in the course of the conversation said it would

**2.** West testified: "Mr. Rothman told me that Mr. McDonough had signed a large number of checks for large amounts of money at the *San* Souci night club and that he, Mr. Rothman, was the manager of that night club and he intended to get his money before Mr. McDonough left Havana. I was quite surprised at this, but I was even more surprised at Mr. Rothman's greeting. When I was introduced to him by Mr. Simon, Mr. Rothman's exact words were these—I beg the pardon of the lady jurors—Mr. Rothman said 'I know all about your being an ex-Texas Ranger and a tough son-of-a-bitch and I don't intend to have any trouble with you if I can avoid it, but the fact

is that I intend to get my money before McDonough leaves Havana.' I then said 'Norman, that is intemperate language and a rash statement for you to make and I think it is entirely out of order.' I told Norman that I had already satisfied myself that no debt existed at all; on the contrary, the checks of money which he mentioned, sums of money which he mentioned, were actually a frame-up, an attempt to swindle Mr. McDonough. Mr. Rothman's face became red, he became angry, he pounded the desk at which we were sitting and he says, 'I have already handled my end of that' and he said 'That son-of-a-bitch will never give me any more trouble.' "

be better for Mr. McDonough to pay the $64,000, "the easier way."

Other circumstances from which West infers that defendants caused the beating are that in March and April, after the January beating, while he was in a hospital, Zamora and Echemendia sent him a telegram[3] and a letter.[4] West reads veiled threats into those expressions of regret. Hector Garcia who was passing along the highway and saw the fight between West and the four assailants, testified by deposition that about ten days after the attack, he saw and identified one of the assailants acting as a gate tender at Tropicana.

In this state of the record, the manager of Sans Souci was angry and was endeavoring to collect $101,000, while the credit manager of Tropicana was trying to collect $64,000. West seems to reason that they were acting in concert since a Dallas attorney received from a Cuban attorney, checks from both night clubs for collection against McDonough. This evidence is no more than a scintilla. In fact, it is not so strong as the evidence in Joske v. Irvine, 91 Tex. 574, 44 S.W. 1059. Moreover, this is one of those instances in which the inferences as reasonably show the nonexistence of an agency on the part of the defendants as they establish the agency. In other words, Sans Souci's management was as active and as interested in collecting its money as Tropicana's. Had the matter been submitted to the jury on the basis of the evidence, the jury could only guess which, if either of the two, had directed the beating. This is pure speculation and is no evidence. Bowles v. Bourdon, 148 Tex. 1, 219 S.W.2d 779, 13 A.L.R.2d 1; Western Tel. Corp. of Texas v. McCann, 128 Tex. 582, 99 S.W.2d 895; Gulf C. & S. F. Ry. Co. v. Davis, Tex.Civ. App., 161 S.W. 932; 38 Tex.Law Rev. 361, 365.

Accordingly, we affirm the judgment upon the instructed verdict.

3. "Regret to Hear You Were Ill We Praying for a Quick Recovery
    "Sincerely yours—
    "Fox Y Echemendia—"

4. " * * *
    "Kirby knows that he has an honest debt with us and should not let other unhappy events in Havana alter his sense of moral responsibility."