**RAINBOW EXPRESS, INC., Appellant,**

**v.**

**Billy Joe UNKENHOLZ, Appellee.**

**No. 9714.**

Court of Appeals of Texas,
Texarkana.

Oct. 3, 1989.

Rehearing Denied Oct. 24, 1989.

J. Gene Bailey, Longview, for appellant.

Brad Morin, Law Office of Jim Ammerman II, Marshall, for appellee.

GRANT, Justice.

In a personal injury action, Billy Joe Unkenholz obtained a judgment against Rainbow Express, Inc. for $38,155 for past damages, $176,200 for future damages and $150,000 for exemplary damages. Rainbow appeals the finding of gross negligence, the award for exemplary damages, and damages awarded for future physical pain.

Rainbow alleges that the trial court erred in submitting the gross negligence issue to the jury, in allowing exemplary damages in the absence of legally or factually sufficient evidence to support such damages, in instructing the jury that acts and omissions of Joe Dixon amounted to acts and omissions of Rainbow, in failing to submit jury questions inquiring whether Joe Dixon was an employee or vice-principal of Rainbow, in failing to order a remittitur of exemplary damages, in rendering judgment for $50,000 for future physical pain without sufficient evidence, and in failing to sustain its objections to the final argument by Unkenholz's attorney.

In the early morning hours of August 5, 1987, Jimmy Wayne Gehring left Houston, Texas, in his truck hauling tractor tires to Illinois. At approximately 7:00 a.m. as he was coming into Marshall, Texas, on Highway 59, the front left tire on his truck blew out, causing him to lose control of his truck. The truck crossed the median and struck the rear bumper of Unkenholz's gasoline tank truck, causing the tank truck to turn over. Unkenholz was afraid that the gasoline in his truck would ignite or explode, and in his haste to get out of the overturned truck he was injured.

We shall first address Rainbow's contentions that the evidence is factually and legally insufficient to support the finding of gross negligence.

In reviewing no evidence points, the court considers only the evidence tending to support the finding, viewing it in the light most favorable to the finding, giving effect to all reasonable inferences therefrom, and disregarding all contrary and conflicting evidence. *Glover v. Texas General Indemnity Co.*, 619 S.W.2d 400 (Tex. 1981). Insufficient evidence points require that we consider and weigh all the evidence. *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660 (1951). In *In re King's Estate*, the court did not hold that a jury verdict will be overruled "only if it shocks the conscience," as urged in the appellee's brief.

■ Ordinary negligence is raised to the level of gross negligence by the mental attitude of the defendant. This attitude must amount to conscious indifference to the rights, welfare and safety of others and can be inferred from all of the acts, omissions and circumstances. *Burk Royalty Co. v. Walls*, 616 S.W.2d 911 (Tex. 1981). To establish gross negligence, there must be evidence which makes it fair to conclude that the defendant has decided to ignore the rights of the injured party, even in light of the probable and threatened injury. The defendant's mental state may be inferred when the evidence demonstrates that under the surrounding circumstances a reasonable person would have realized that his or her conduct created an extreme degree of risk to the safety of others. *Williams v. Steves Industries*, 699 S.W.2d 570 (Tex.1985).

The jury found that Rainbow, Joe Dixon, and Dennis Hockabout were negligent and that such negligence proximately caused Unkenholz's injuries. Rainbow did not appeal these findings. Therefore, the only question about negligence on appeal concerns gross negligence.

After the wreck, Unkenholz saw the tire that had blown out, and he asked Gehring whether he knew that his tire was so badly worn. Unkenholz and Calvin Davis testified that Gehring admitted to them that he had told his boss, Joe Dixon, that he needed new tires and that Dixon told him to go ahead and drive on the old tires to Illinois. Gehring confirmed by his testimony that this dialogue with Dixon occurred. Dixon denied that Gehring had made this request. Dennis Hockabout, a terminal manager for Rainbow, inspected Gehring's rig the day before the accident and testified that he found nothing wrong with the tires. Hockabout further testified that there was thirty-five to forty percent remaining above the marker line (which is an inset of rubber between the tread to show how much the tread is worn).

There was testimony that in order to meet the Department of Transportation's (DOT) standards for a truck tire, the tire must have four thirty-seconds of an inch tread.* The DOT regulations set forth that the purpose for establishing criteria for the inspection of motor vehicles for such requirements is to reduce deaths and injuries attributable to the failure or inadequate performance of matters covered by those regulations. 49 C.F.R. § 570.52 (1988). Testimony was conflicting as to whether or not the tire in question met this tread depth standard.

Joe Dixon, the owner of the truck and an experienced truck driver, measured the tire tread on the tire fragments at two different places, and he testified that the tire gauge read six thirty-seconds of an inch. He admitted that if the tire had any spot on it that was below four thirty-seconds, it did not meet the DOT standard.

Calvin Davis, a supervisor of transportation for Texaco, Inc. who was in charge of the safety and inspection of about 100 trucks for that company, testified that in his opinion the tire did not have enough tread to meet the DOT standard. He testified that some parts of the shoulder were high and some parts were low and that if the tread were measured in certain places, it would be less than four thirty-seconds of an inch of rubber. He further testified that his company requires that the front tires exceed the federal regulations by requiring six thirty-seconds of an inch of tread.

Gene Fletcher, a highway patrolman for nineteen years, testified that in his opinion there was not enough tread on the tire that had blown out and that one of the dangers of insufficient tread was a blowout.

There was testimony concerning the danger which was created when a tire did not have sufficient tread. Calvin Davis answered questions concerning the inherent danger as follows:

Q. Could you tell the jury what the danger is of driving with a tire like this on the front of your tractor-trailer rig?

A. The heat buildup in these—the places right here is going to be quite a bit greater causing it to give out in that spot.

Q. This was in August, would that have any effect on it, the time of the year?

A. Oh, yes, the hotter the weather, the hotter the tire.

Q. And what would happen if the tread separates?

A. It comes apart like this.

Q. And then, I guess if you had the blowout, you could be—to be expected?

A. I see the difference in the thickness of the tire here and here.

Q. Okay. Mr. Davis, as a supervisor for Texaco, would you run that tire on one of your trucks?

A. No, I would not.

---

* 49 CFR § 570.62 (1988) in pertinent part states:

(a) *Tread depth.* The tread shall be not less than four thirty-seconds of an inch deep on each front tire of any vehicle other than a trailer....

(1) *Inspection procedure.* For tires with treadwear indicators, check for indicators in any two adjacent major grooves at three locations spaced approximately 120° apart around the circumference of the tire. For tires without treadwear indicators, measure the tread depth with a suitable gauge or scale in two adjacent major grooves at 3 locations spaced approximately 120° apart around the circumference of the tire at the area of greatest wear.

There is evidence that Gehring called the need to replace the tires to Dixon's attention. Hockabout was also aware of the condition of the tire shortly before the blowout. There is ample evidence to show that Dixon and Hockabout should have been aware of the threat of a blowout. However, the burden on Unkenholz is not merely to show that they were aware or should have been aware of the risk of a blowout, but Unkenholz must also show that they were aware that the blowout itself would create an extreme degree of risk. The only direct testimony concerning the potential of a blowout to cause an accident was from patrolman Gene Fletcher. He testified that he believed that any kind of vehicle could be kept under control even with a blowout. In later testimony, Fletcher qualified this statement:

> Q. Okay. In other words, a blowout will never result in an accident?
>
> A. Oh, I didn't say that. I said, you can control it, keep it on your side of the road.

In his brief, Unkenholz takes the position that a probable loss of control is not the issue, because there was an actual loss of control. This merely argues the adage that hindsight is 20/20. To obtain exemplary damages, Unkenholz must show that prior to the occurrence, Dixon and Hockabout were aware that the situation presented a probable and threatened injury. Their mental state may then be inferred from the action or inaction of Rainbow's agents. Rainbow argues that, at the most, Dixon's and Hockabout's decision not to replace the tires was an error in judgment and not gross negligence. However, Unkenholz may prove gross negligence by showing that under the surrounding circumstances a·reasonable person would have realized that this conduct created an extreme degree of risk to the safety of others. *Williams v. Steves Industries,* 699 S.W.2d at 573. If the situation is one in which the act would reasonably be thought to be highly dangerous, the courts have not hesitated to allow punitive damages upon a finding of gross negligence. *Williams v. Steves Industries,* 699 S.W.2d at 573.

Rainbow points out that there is no evidence that the blowout of a front tire on a truck would cause any danger. While there is no direct evidence as to the probability of deaths or injuries resulting from such blowouts, there is ample evidence from which a jury could infer such danger. Unkenholz testified as follows:

> You don't leave a tire like that on a truck for the steering axle. That's the only safety thing that a man has in that truck is his steering, and if you put tires on the steering axle that's going to blow out or have the possibility of blowing out, you're putting him and everybody on the highway in jeopardy.

There is also the testimony of Calvin Davis that he would not run the trucks under his supervision with a front tire in that condition. Officer Fletcher testified that he would not have driven the truck with a front tire in that condition and that the tire in question should not have been on the highways of Texas.

From the entire record, the jury could have reasonably inferred that the tire in question presented a highly dangerous condition.

■ Considering the surrounding facts and circumstances, the jury had a sufficient basis to infer that Dixon's and Hockabout's mental attitude in deciding not to replace the tires was one of conscious indifference, and that the decision was made with full realization of the extreme degree of risk to the safety of others travelling the highways.

We find that there is evidence and reasonable inferences therefrom to support the jury's gross negligence finding, and considering and weighing all of the evidence, we find it to be factually sufficient to support the jury's gross negligence finding.

■ It is undisputed that Hockabout was a terminal manager with the right to direct and discharge servants; therefore, there is no question that Hockabout was a vice-principal whose conduct could be considered in determining the mental attitude of Rainbow.

Next, we must consider whether Rainbow is responsible for the acts and omissions of Dixon. Rainbow has complained of the trial judge's failure to submit a jury question as to whether Dixon was an employee or vice-principal of Rainbow and further of the trial judge's instruction to the jury that Rainbow was responsible for Dixon's acts and omissions.

■ In order to impose exemplary damages on a corporation for acts of its agent, there must be evidence not only that the actor was an employee, but also that the agent was employed in a managerial capacity or that the agent was performing an act authorized by the principal or managerial agent or that the principal ratified or approved the act of the agent. *Missouri Pacific Railroad Co. v. Dawson*, 662 S.W.2d 740 (Tex.App.—Corpus Christi 1983, writ ref'd n.r.e.).

■ Unkenholz contends that Rainbow did not preserve its objection to the jury instruction concerning Rainbow's responsibilities for Dixon's acts and omissions. Rainbow made the proper objection, but the judge, without ruling upon the objection, included the challenged instructions in the jury charge. If an objection is made and the trial judge makes no change in the charge, the objection is, of necessity, overruled. *Acord v. General Motors Corp.*, 669 S.W.2d 111 (Tex.1984).

■ Dixon leased his trucks to Rainbow because Rainbow had state and federal permits for the operation of the trucks. Under the agreement between Dixon and Rainbow, Dixon was to maintain the trucks. Article 6701c–1, § 4, of Texas Revised Civil Statutes provides in part that the operation of a leased motor vehicle shall be under the full and complete control and supervision of the person to whom the vehicle is being leased. Tex.Rev.Civ.Stat. Ann. art. 6701c–1, § 4 (Vernon Supp.1989). In *Ridgway v. Gulf Life Ins. Co.*, 578 F.2d 1026 (5th Cir.1978), the court held that if the lease did not provide for full and complete control and supervision in the lessee, such a provision pursuant to Article 6701c–1, § 4 will be applied. Thus, the duty of maintenance and repair is a nondelegable

function that is required to be under the control of the lessee. *See also, Berry v. Golden Light Coffee Co.*, 160 Tex. 128, 327 S.W.2d 436 (1959); *Greyhound Van Lines, Inc. v. Bellamy*, 502 S.W.2d 586 (Tex.Civ. App.—Waco 1973, no writ).

■ Included in those classified as vice-principals are those engaged in the performance of nondelegable or absolute duties of the master. *Southwestern Bell Telephone Co. v. Reeves*, 578 S.W.2d 795 (Tex.Civ.App.—Houston [1st Dist.] 1979, writ ref'd n.r.e.). Dixon was undisputedly engaged in the performance of the nondelegable duty of keeping the truck properly maintained; therefore, he was a vice-principal as a matter of law.

We conclude that the trial court did not err in failing to submit a jury question on whether Dixon was an employee or vice-principal of Rainbow or in instructing the jury that Rainbow was responsible for Dixon's acts and omissions.

Rainbow contends that the trial court erred in failing to order a remittitur of the award of exemplary damages, which was in the amount of $150,000.

In our review of a request for remittitur, the proper standard is factual sufficiency. We examine all the evidence in the record to determine whether sufficient evidence supports the damage award, remitting only if some portion is so factually insufficient. *Pope v. Moore*, 711 S.W.2d 622 (Tex.1986).

■ The determination of the amount of exemplary damages must depend upon the facts of each particular case. The factors we must consider in determining whether the award of exemplary damages is reasonable include the nature of the wrong, the character of conduct involved, the degree of culpability of the wrongdoer, the situation and sensibilities of the parties concerned, and the extent to which such conduct offends the public sense of justice and propriety. *Alamo National Bank v. Kraus*, 616 S.W.2d 908 (Tex.1981).

■ The amount of the exemplary damages is less than the actual damages in the case. (The ratio of actual damages to ex-

emplary is one to seven tenths.) The jury had before it sufficient evidence to conclude that the dangerous condition of the tire on the front wheel of Rainbow's large truck travelling across the country subjected numerous people on the highways to the danger of the truck having a blowout. There was also evidence that after this situation was called to Dixon's attention, the driver was told to take the truck on the highways without a replacement of the worn tires.

We find that there is sufficient evidence to support the jury's award of exemplary damages and that the trial court did not err in failing to require a remittitur of such damages.

Rainbow has challenged the sufficiency of the evidence to support the award of $50,000 for future pain. There is no yardstick or scale to measure or weigh the pain. The law recognizes that pain is a proper item for recovery and that it is susceptible only to an approximate money evaluation. *Sunset Brick & Tile, Inc. v. Miles*, 430 S.W.2d 388 (Tex.Civ.App.—Corpus Christi 1968, writ ref'd n.r.e.). Future pain is necessarily speculative, and it is particularly within the province of the jury to set the amount of such damages. *Ruffo v. Wright*, 425 S.W.2d 663 (Tex.Civ.App.—San Antonio 1968, no writ).

■ Unkenholz has produced evidence to serve as a basis for an estimation of the future damages for pain. He suffered a torn cartilage in his left knee, an injury to his left shoulder, his neck, his lower back, and his wrist. The treating physician described Unkenholz's lower back stiffness and tender wrist as chronic problems. Unkenholz described the knee as being sore all the time. His work aggravated these problems. He testified that he could not haul a load without severe pain and that the injuries impaired his work ability in his daily activities. The treating physician suggested that Unkenholz be retrained for another type of work. The doctor described Unkenholz's chondromalacia (softening of the joint cartilage) as chronic with a fifteen percent permanent physical impairment to his left leg. He predicted that Unkenholz would continue to have knee problems.

Unkenholz testified that he had been diagnosed as having some defective disks in his lower back, but they were not operable at the time of the trial. He also testified that the doctor had told him that there might be a need for additional surgery on his knee, as well as surgery on his left wrist for the purpose of fusing two bones together to alleviate the pain. Unkenholz was forty-seven years of age at the time of trial and had a life expectancy of twenty-eight years. After considering and weighing all of the evidence, we find that there was sufficient evidence to support the jury's finding on the amount of damages for future pain.

■ Next, we look at Rainbow's contention of errors in the final argument. In the case of allegedly improper jury argument, the complainant has the burden to prove (1) that there was an error, (2) that the error was not invited or provoked, (3) that the error was preserved by the proper trial predicate, such as an objection, and (4) that the error was not curable by an instruction. There are only rare instances of incurable harm from improper argument. The complainant has the further burden to prove that the argument by its nature, degree and extent constituted reversibly harmful error. All of the evidence must be closely examined to determine the argument's probable effect on a material finding, and a reversal must come from an evaluation of the whole case. *Standard Fire Ins. Co. v. Reese*, 584 S.W.2d 835, 839 (Tex.1979); *Padget v. Gray*, 727 S.W.2d 706 (Tex.App.—Amarillo 1987).

Rainbow complains of four statements made in the final argument by Unkenholz's attorneys. The arguments were as follows:

I'd like to challenge Mr. Bailey to fill in figures that he would be willing to take if he had the injuries that Mr. Unkenholz —.

. . . .

I wouldn't go through this for the money that the Unkenholz's (sic) are asking.

. . . .

If they ever come in this Courtroom with an envelope with $900,000.00 in it and say, Mr. Unkenholz, here's some money, here's an envelope, take it; but before you do, let me tell what you've got to do.

. . . .

So you've got to live the rest of your life continually crippling yourself. And for that, we're going to let you take this envelope.

 The trial court sustained the objections to the first two statements and instructed the jury to disregard the statements. The court's instruction was sufficient to cure any error relating to the statements made by counsel. *See Otis Elevator Company v. Wood*, 436 S.W.2d 324 (Tex. 1968).

 Counsel did not object to the third statement. Counsel objected to what Unkenholz's counsel was about to say. Since there was no objection to this particular portion of the final argument, no error is preserved as to that portion.

 The objection to the fourth statement was overruled, and the trial counsel continued:

Mr. Unkenholz would not pick up that envelope. He would not pick up that envelope. Now, he has no choice, and this jury's job is to fill it.

In talking about the facts before the jury, it would have been better if counsel had offered the characterization in a third person reference to Unkenholz rather than the second person *you*, but the argument itself sufficiently tied the reference to Unkenholz. Counsel is not required to make such a lukewarm and sterile argument that the jury is unable to determine which side of the case he is on, and likewise counsel must be indulged the privilege of flights of oratory. *Houston Lighting & Power Co. v. Fisher*, 559 S.W.2d 682 (Tex.Civ.App.—Houston [14th Dist.] 1977, writ ref'd n.r.e.). The final argument is designed to be persuasive, and so long as it is based upon the facts and issues raised by the evidence and not so inflammatory as to influence the jury to render an improper verdict, the argument is not intrinsically improper.

*Louisiana & Arkansas Railway Co. v. Capps*, 766 S.W.2d 291 (Tex.App.—Texarkana 1989, no writ). It is traditional to use figures of speech as tools of oral advocacy, and we find the reference to the envelope was not error.

The judgment of the trial court is affirmed.