APACHE CORPORATION, Appellant,

v.

Leo MOORE, Daisy Moore, and Bess Cole, Appellees.

No. 07–93–0069–CV.

Court of Appeals of Texas, Amarillo.

July 29, 1994.

On Motion for Rehearing Oct. 20, 1994.

Liddell Sapp Zivley Hill & Laboon L.L.P., Jess H. Hall, Jr., Jeff Weems, James E. Essig, Kathy Osman, Houston, for appellant.

Clements O'Neill & Pierce L.L.P., Jack O'Neill, Kelly J. Kirkland, Jerry L. Mitchell, Jr., Burrow, Countiss & Ray L.L.P., Richard N. Countiss, Houston, for appellee.

Daisy Moore, pro se.

Before REYNOLDS, C.J., and BOYD and POFF, JJ.

REYNOLDS, Chief Justice.

A jury found Apache Corporation liable for actual and exemplary damages resulting from its negligence proximately causing a gas well to blow out. A portion of the damages were allocated to Leo Moore, Daisy Moore, and Bess Cole, designated as the Moore group, who are royalty interest owners in tracts adjoining the location of the well, and who intervened in the litigation as plaintiffs. By this appeal, Apache complains of the damages awarded to these plaintiff-intervenors.

As to these intervenors, Apache challenges (1–2) the legal sufficiency of the evidence to support their actual and exemplary damage awards, (3) the segregation of attorney's fees as a separate part of the exemplary damages awarded, (4) the constitutionality of the Texas scheme of awarding exemplary damages, and (5) the admission of testimony by an expert witness unidentified by, but presented on behalf of, Daisy Moore. On the rationale expressed, the judgment will be modified to eliminate the attorney's fees allocated to the intervenors and, as modified, affirmed.

In January of 1981,[1] the Elk City, Oklahoma office of Apache, working as operator, was responsible for drilling and spudding one of the deepest wells, more than 16,000 feet, in the Anadarko Basin in Wheeler County, Texas, the Key 1–11 well. Apache, together with El Paso Exploration Company, now known as Meridian Oil Production, Inc., and referred to as Meridian, were each 50% working interest owners of the Key 1–11 well.

Ratliff Drilling Company was hired by Apache to drill the well. Although Apache maintained Ratliff was an independent third party, the evidence showed that Apache controlled the Ratliff employees in the drilling operation, its drilling superintendent took charge of the well, and was ultimately responsible for the safe and proper drilling of the well.

During the drilling of the well, metal shavings were found in the drilling mud. The testimony at trial showed that metal shavings were often indicative of worn out casings or tubing allowing the metal of the drilling pipe to rub and shave off, thereby weakening the equipment in the hole. No logs or tests were run to determine the origin or cause of the metal shavings.

In July, the well experienced a "kick," i.e., the well began to flow, causing cement, which had been placed to secure the liner at the bottom of the hole, to back up through the hole into the intermediate casing, where it hardened. The well was being attended by employees of Ratliff at the time of the kick since no one from Apache was present on the well-site. Although someone from Apache was to be present on the well 24 hours a day, no one could be reached for assistance for several hours after the kick occurred.

After the cement was drilled out of the casing, no tests were conducted to determine whether the casing had been damaged. Upon completion and perforation of the well, a pressure leak occurred at the surface, denoting pressure on the backside of the well, which placed the intermediate casing under stress. Ignoring its drilling superintendent's recommendation to pull the tubing and repair the leak, Apache conducted a single test to determine the source of the leak, but did not find it.

Without any further effort to determine the source of, or to repair, the leak, despite knowing the leak would create pressure and place stress on the intermediate casings, Apache shut in the well in July to await

1. All dates referenced are in the calendar year 1981 unless otherwise indicated.

connection to a pipeline. To relieve pressure on the well due to the leak, Apache had Axelson, Inc., a company which manufactured and marketed pressure relief valves for oil wells, install a casing relief valve on the well.

Originally, the relief valve was set up to use outside air to function, but when that system became unworkable, two nitrogen bottles were installed. Apache admittedly knew that without a flow of nitrogen, the valve would not operate, and if the valve became inoperable, the pressure in the well would continue to build, making the likelihood of a blowout a reality. Ralph Walker, Apache's drilling superintendent, directed that the valve be set to relieve pressure when it reached 7,000 pounds, and cut off when the pressure was relieved to 6,000 pounds. There was testimony that the settings were inordinately high.

On October 4, the well blew out. The expert testimony, including that presented by Apache, was that the relief valve had not been in proper working order for approximately two weeks prior to the blowout. There was conflicting testimony concerning whether the nitrogen flow was hooked up to the relief system at the time of the blowout. Although there were differing theories as to the exact cause of the blowout and which portion of the well failed first, it was the overall consensus that, in all likelihood, the pressure from the leak built to more than 10,000 pounds, causing the seven and five-eighths inch casing to rupture.

Fortunately, no one was present at the well at the time of the blowout, but the well proceeded to vent, flare, dissipate, and waste natural gas at a significant rate until Apache was able to divert the gas into a pipeline of the Key number 3 well in June of 1992. The Key 1–11 well continued to flow as a result of the blowout until it was killed on 9 February 1993. In terms of the gas lost, the blowout was believed to be the largest gas well blowout in United States history, there being 14.3 billion cubic feet of gas drained from the reservoir, and the total value of the gas wasted was approximately 69 million dollars. Apache received approximately 41 million dollars for the gas it captured from the well from June, 1992 until the well was killed in February, 1993.

As a result of the blowout, Arkla Exploration Company and Stevens Production Company brought suit against Apache and Meridian seeking recovery for conversion of gas diverted from the neighboring Kiker No. 2–1 well, and for negligence. Subsequently, Apache and Meridian brought third party actions against Babcock & Wilcox Company, Hydril Company, Sooner Pipe and Supply Corporation, Axelson, Inc., and U.S. Industries, Inc., alleging that products manufactured by them were responsible for the blowout. The Scott group—comprised of Tom L. Scott, Inc., George S. Johnson, Sunshine Exploration Company, W.W. Braden, III, and Canyon Energy, Inc.—and the Moore group—comprised of Leo Moore, Daisy Moore, and Bess Cole—joined the suit as plaintiff-intervenors.

Claims of negligence and gross negligence against Apache stemmed from allegations that Apache company men working on the Key 1–11 well took kickbacks in the forms of money, cocaine, alcohol, prostitutes, and the like, in exchange for giving work to various companies, specifically White Stripe Inspection Company, which affected the quality of their work and their diligence and vigilance in operating the well.[2] Apache was aware, prior to the blowout, that kickbacks were being taken by its employees, and formed an investigation team to determine the extent of the kickbacks.[3]

---

**2.** These allegations spawned two mandamus actions leading to discovery of the kickbacks and testimony of expert witnesses. *Axelson, Inc. v. McIlhany*, 798 S.W.2d 550 (Tex.1990); *Tom L. Scott, Inc. v. McIlhany*, 798 S.W.2d 556 (Tex. 1990).

**3.** White Stripe sued Apache for unpaid invoices. Apache successfully counterclaimed, alleging White Stripe paid kickbacks to Apache employ-ees, which affected the diligence and vigilance of their work. A portion of the evidence at the trial in this instance was taken from depositions, attorney arguments, and investigations conducted in connection with the White Stripe litigation, wherein Apache took the position that the kickbacks adversely affected the work of its employees.

In the time intervening between the original petition, filed in January of 1982, and the selection of the jury in the summer of 1992, all parties except Apache, Meridian, third-party defendant Axelson, the Scott group, and the Moore group had settled their controversies. Before the trial on the merits, Axelson settled its controversies and, as part of that settlement, agreed to pay attorney's fees for the Scott group.

In addition to evidence of the earlier recounted events, the jury had for its consideration this alphabetical cast of pertinent characters and their roles in connection with the Key 1–11 well:

Andy Atchley—a "worm" for Ratliff, was sent to get metal shavings found in the well while it was being drilled. He saw Apache use bent pipe in the hole, and testified that after the kick, he thought the Key 1–11 well was a "time bomb waiting to go off."

Gordon Clower—drilling foreman for Apache, was responsible for drilling the well and conducting all operations on the well after spudding. Clower was supposed to have been on the well site when the kick occurred, but was absent. Statements by Ralph Walker and others indicated Clower was not capable of handling the responsibilities given him by Apache; there was evidence that he was frequently drunk or incoherent on the job and that the Elk City office was aware of his problem with alcohol.

Bill Conner—drilling manager for Ratliff, testified Apache used crooked pipe in the hole and chose not to use drilling rubbers which would have kept the casings from wearing out. Ratliff hired Jim Gerlach over Conner's objections; Gerlach was inexperienced and drank on the job. Ralph Walker often left Gerlach alone and in charge of the well despite Walker's own testimony that Gerlach was not as knowledgeable as he should have been.

Earl Wayne Eller—who "dogged" Ralph Walker's heels but was never formally trained, was put in charge of drilling and completing wells for Apache. Upon Ralph Walker's orders, he ordered the Axelson relief valve after the kick. Eller described the effects of kickbacks on the Key 1–11 well prior to the blowout as "twenty four hours in paradise," and admitted, "Oh, I guess when I was using [cocaine], I always worked a little bit better with a nose full of coke." Eller is currently a recovering cocaine addict.

Jim Gerlach—toolpusher for Ratliff, testified that at the time of the kick, no one from Apache was present on the well site, so he handled the situation until Ralph Walker arrived several hours later. Against ordinary custom, the Key 1–11 well was built without pre-construction meetings, and was built as they "went along." Prior to the kick, Gerlach found metal shavings in the drilling mud and reported his findings to Ralph Walker; although ordinary practice was to run logs to determine the source of the metal shavings, such was not done in this instance. After the discovery of the leak, Gerlach suggested Apache kill the well and pull the tubing to find the leak, but this was not done.

Darrell Lee McDonel—salesman for White Stripe Inspection Company, saw Apache men drinking when the rig needed attention, knew White Stripe did not perform the inspections invoiced, and knew Apache used unusable pipe in the Key 1–11 well. McDonel testified that the usual practice for a White Stripe inspection was not a good inspection.

Danny Ray Merz—part owner of White Stripe, did business with Gordon Clower and Ralph Walker, and provided kickbacks in the form of alcohol, cocaine, prostitutes, cash, and the like to Apache employees on the site of the Key 1–11 well, as well as other locations, during working hours both before and after the blowout. Merz testified that he had seen Clower drunk or incoherent on the well during working hours, and had seen Terry Tate drunk or on drugs on site and on duty. He also testified that Tate reported the leak in the well to the Tulsa office of Apache prior to the blowout, but nothing was done about it, and Tate felt that a hole in the tubing resulting from the kick was the ultimate cause of the blowout. Merz was ultimately

convicted of tax fraud, tax evasion, and mail fraud in connection with the kickback scheme devised by White Stripe and Apache employees.

Carmen Neece—sectary/receptionist for Apache, was asked to inform Apache's kickback investigation team of the events in the Elk City office and on the Key 1–11 well. She testified that Tom Reames would estimate the pressures and phone in false daily reports because he did not go out to the well everyday, and that he was eventually fired because he "had not been on location for four days," and the well "had pressured up and blown out." Her spying revealed that Gordon Clower's drinking was obvious and his superiors in the Elk City office were aware of it, and there was widespread use of kickbacks in the form of cocaine on the Key 1–11 well. She further testified that Douglas Storts asked her to destroy bills from vendors to Apache.

Al Perlin—former in-house counsel for Apache, conducted an investigation of kickbacks taken by Apache employees in 1982; however, he was aware of such investigations by Apache as early as 1980. Perlin testified that the law presumes kickbacks affect the way people perform their jobs. He testified that, as operator, Apache was charged with the responsibilities of (1) properly drilling the well, (2) safety, and (3) hiring competent companies to work on the well. His investigation showed that both the Tulsa and Elk City offices were "on the take" and Douglas Storts was supplied with cocaine by Donnie Snapp, therefore, Storts would not fire Snapp.

Gregory L. Pyles—was hired by Apache in 1984 to investigate kickback operations and verify the use of kickbacks by Apache employees. He discovered there was drug use on the Key 1–11 well and there were inflated invoices for work on the well. He verified that Apache employees working on the Key 1–11 well used drugs and participated in kickback schemes prior and subsequent to the blowout.[4]

Tom Reames—pumper for Apache, checked the Key 1–11 well 12 to 15 times between September and the blowout of the well in October, but did not check casing pressure or the pop-off valve on the relief system, and did not report to anyone his readings on the tubing pressure or that he heard gas leaking from the well after it was shut in. Reames testified he was instructed by Tate to check the well for missing property, but was not advised to check or report the pressures, nor to check the connection of the nitrogen bottles, and would not have known what he was looking for had he been told to check the gauges.

Donnie Snapp—drilling foreman for Apache out of the Tulsa office, was implicated by testimony to have been heavily involved in kickbacks connected with the Key 1–11 well, but when directly questioned, he repeatedly invoked his Fifth Amendment right against self-incrimination. Snapp testified that Apache utilized inexperienced people, and Gordon Clower failed to do his job, and was subsequently fired.

Lloyd Sommers—the person in Apache's Tulsa office who acted as a liaison to the Elk City office and the Key 1–11 operation. He was Ralph Walker's immediate superior.

Paul Douglas Storts—drilling manager and petroleum engineer for Apache, had management responsibility for the well and was in charge of the well from its inception. He was involved in the day-to-day evaluation of the Key 1–11 well, but his decisions regarding completion of the well were reviewed by Apache management. Storts theorized that the cause of the blowout was that the tubing failed, causing the casing strings to fail, causing the pipe to fail. He further testified that "Apache had too many well operations and not enough people—people that weren't taking care of their job," and the Key 1–11 well operation "was poorly supervised in the field."

Terry Tate—Apache's production foreman for the Key 1–11 well, was responsible

---

4. Virtually all Apache employees who were involved in the kickback scheme on the Key 1–11 well, many of whom are identified in this opinion, pleaded guilty to criminal offenses charged in connection with the kickback scheme.

for hookups and pumpers. He admittedly took kickbacks in exchange for work and knew there were fictitious invoices connected with the well, knew there was cocaine readily available at the Key 1–11 well, and knew that kickbacks existed in all oil patches in the 1980's. He testified that he wouldn't have anyone on drugs working on the well, but he was taking amphetamines while working on the Key 1–11 well "to stay awake."

Ralph Walker—former superintendent for Apache in its Elk City district was the drilling foreman on the Key 1–11 well until he was replaced by Gordon Clower after spudding, when Walker became a superintendent. Either Walker or Lloyd Sommers was responsible for Clower's position on the Key 1–11 well. Walker was the first Apache company man on the scene after the kick and he ordered the Axelson relief valve be installed to relieve pressure on the casings. He instructed Terry Tate to check the pressure daily. He testified that from what he knew about wells, he did not see how the nitrogen bottles could have been hooked up at the time of the blowout, and further, Apache did not "have enough hands," and their hands had "a lot of control over how much service work they had, more so than most company men for other oil companies."

The jury found Apache was negligent and grossly negligent in causing the blowout and, resultingly, they awarded a total of $81,282 actual damages, $4,000,000 exemplary damages exclusive of attorney's fees, and $500,000 attorney's fees, to the Scott group and the Moore group.

As material to this appeal, the jury found that of the $81,282 actual damages, Leo Moore and Daisy Moore each were entitled to $2,705, and Bess Cole was entitled to $5,425, to compensate them for the value of natural gas and condensate attributable to them which flowed from the Key 1–11 well bore. The jury found that the $4,500,000 exemplary damages and attorney's fees should be apportioned in 12.5% increments to each member of the groups, thereby award-

ing each member of the Moore group $562,500.[5]

Following the trial and the jury's verdict, but before judgment was rendered by the trial court, the Scott group dismissed with prejudice all of their claims against Apache and Meridian. Only Apache has appealed, and its appeal is only from the judgment rendered in favor of the Moore group.

Apache presents seven points of error, most of which have subpoints. By its main points, Apache contends that (1) there is no evidence in support of the proper measure of damages; (2) the evidence is legally insufficient to support the award of exemplary damages; (3) the exemplary damage award violates the Texas and United States Constitutions; (4) the trial court erred in failing to remit the jury's grossly excessive award of exemplary damages; (5) the trial court's failure to instruct the jury to consider the gross negligence of specific Apache employees was reversible error, thereby permitting the jury to punish Apache for conduct it did not commit, sanction or ratify; (6) the trial court's separate submission of exemplary damages attributable to attorney's fees was reversible error; and (7) the trial court erred in allowing the testimony of an undesignated expert. We will discuss Apache's contentions of error in logical consecution, with the development of the underlying facts as necessary.

■ The trial court asked the jury to find, and the jury found, the value of the gas and condensate attributable to the Moore group that was lost as a result of the blowout. In initially contending there is no evidence in support of the proper measure of damages, Apache, relying upon *Kraft v. Langford*, 565 S.W.2d 223, 227 (Tex.1978), submits that the Moore group's royalty interests are interests in real property, and that their injuries from the blowout were permanent injuries to realty, for which the one and only proper measure of damages is the difference in market value of the Moore group's royalty interests before and after the blowout. Since the only evidence of damages presented was the value of gas lost, and there was no evidence of the

---

5. The jury also made findings of, and awards for, conversion, but failed to find the conversion was wrongful or intentional. The Moore group elected to pursue only the negligence claims.

before and after difference in market value of the royalty interests, Apache concludes the Moore group did not evidence the proper measure of damages and, therefore, the jury's award for actual, as well as for exemplary, damages must fail.[6]

Apache's contention that the Moore group's injuries were permanent injuries to realty and subject to a single measure of damages is supported in part by the holding in *Texon Drilling Co. v. Elliff,* 210 S.W.2d 553 (Tex.Civ.App.—San Antonio 1947), *rev'd and remanded, sub nom. Elliff v. Texon Drilling Co.,* 146 Tex. 575, 210 S.W.2d 558 (1948). The factual situation in *Elliff* mirrors that in the present litigation in that a gas well blowout on land adjacent to land in which the Elliffs owned royalty interests, alleged to have been caused by Texon's negligence, drained gas and distillate from under the Elliffs' land and allowed the gas and distillate to escape into the air. The litigation produced opinions upon which both parties in the present litigation rely to some extent.

In the trial court, the Elliffs recovered damages for the amount of the gas and distillate which had been drained from their property as a result of the blowout. On appeal, the intermediate court of civil appeals was called upon to determine whether the recovery allowed the Elliffs was based upon a proper theory of recovery. 210 S.W.2d at 554. In determining the theory was not supported by Texas law, *id.* at 555, the court reasoned that since the nature of Elliffs' action was one for damages to realty, the damage issues submitted were evidentiary and not controlling, and the submission was error because recovery for lost gas was barred by the law of capture. *Id.* at 556–57. In that court's opinion, the rule that where land is permanently injured the usual measure of damages is the depreciation in value

occasioned by the wrongful act, was applied to mineral estates. *Id.* at 557. Thereupon, the court reversed the trial court's judgment and remanded the matter for a new trial without reaching Texon's remaining points of error. *Id.* at 557–58.

Upon further appeal, the Supreme Court determined the intermediate appellate court was without authority to pass upon the propriety of the measure of damages since no such assignment of error had been presented in that court, and, as a consequence, the Court declined to express an opinion on that question. 210 S.W.2d at 560. In so doing, the Court recognized that the difference between fair market value of royalty interests before and after a blowout is not, as Apache contends, the exclusive measure of damages for injuries so suffered; indeed, the Court held that the Elliffs were entitled to recover such damages as would reasonably compensate them for the loss sustained as the proximate result of Texon's negligent conduct. Pointedly, the Court stated that it could not affirm the judgment of the trial court because Texon had challenged the sufficiency of the evidence to support the amount of damages the jury found, and had charged the verdict was excessive, complaints over which the Court had no jurisdiction. *Id.* at 563.

Upon remand, the intermediate appellate court viewed the Supreme Court's opinion as deciding that the Elliffs "could recover as and for the taking and destruction of gas and distillate which [the Elliffs] owned or in which they had a property interest," and their damages would not be governed by the measure of damages relating to real property. *Texon Drilling Co. v. Elliff,* 216 S.W.2d 824, 830–31 (Tex.Civ.App.—San Antonio 1948, writ ref'd n.r.e.). Thus, Apache's contention that the Moore group's damages must be governed by the measure of dam-

---

6. Parenthetically, it is noticed that prior to the submission of the issue of the Moore group's actual damages to the jury, Apache requested an issue utilizing the same measure of damages, *i.e.,* the value of gas lost, to be given in connection with its third-party action against Axelson. Apache's requested issue would ordinarily waive any error in the submission of the identical issue, *see Northeast Texas Motor Lines v. Hodges,* 138 Tex. 280, 158 S.W.2d 487, 488 (1942), because

Apache cannot invite error by requesting an issue and then objecting to its submission. *General Chemical Corp. v. De La Lastra,* 852 S.W.2d 916, 920 (Tex.), *cert. dism'd,* — U.S. —, 114 S.Ct. 490, 126 L.Ed.2d 440 (1993). However, since Apache's submission was not made in response to the submission given, and Apache raised sufficient objections to the Moore group's submission, Apache is entitled to have its contention resolved.

ages for injury to real property fails, together with its notion that there is no evidence to support the "proper measure of damages" since the "proper measure" was not submitted.

■ Moreover, we are of the opinion that the Moore group's injuries were not permanent. Permanent injuries to land give rise to a cause of action for permanent damages which are normally measured as the difference in the value of the property before and after the injury. Temporary injuries give rise to temporary damages, or the amount of damages which accrued during the continuance of the injury covered by the period for which the action is brought. *Bayouth v. Lion Oil Co.*, 671 S.W.2d 867, 868 (Tex.1984). The proper measure of damages is dependent upon whether the injury to the realty is permanent or temporary in nature. *Kraft v. Langford*, 565 S.W.2d at 227.

■ The characterization of an injury as either permanent or temporary is determined by its continuum. Permanent injuries to land result from an activity of such a character, and existing under such circumstances, that it will be presumed to continue indefinitely; the injury must be constant and continuous, not occasional, intermittent or recurrent. *Atlas Chemical Industries, Inc. v. Anderson*, 524 S.W.2d 681, 684 (Tex.1975). Temporary injuries result where the injury is not continuous, but is sporadic and contingent upon some irregular force such as rain. *Bayouth v. Lion Oil Co.*, 671 S.W.2d at 868.[7]

Although the blowout effectively ceased production from the Key 1–11 well, when the gas was diverted to the Key number 3 well pipeline, the injury to the Moore group was terminated. An injury which can be terminated cannot be a permanent injury. *Kraft v. Langford*, 565 S.W.2d at 227.

■ The proper measure of damages for temporary injuries to realty is the amount of

damages which accrued during the continuance of the injury. *Id.* By their action, the Moore group sought recovery only of the gas lost during the occurrence of the blowout, *i.e.*, their injuries were contingent upon the irregular force of the blowout, and they sought recovery for damages which accrued during the blowout. For these reasons, Apache's first point of error is overruled.

■ Utilizing a three-prong-attack in its second point of error, Apache challenges the legal sufficiency of the evidence to support the jury's award of exemplary damages to the Moore group. Apache contends that (1) evidence of ordinary negligence is inadequate as a matter of law to support a finding of gross negligence, (2) the Moore group did not prove a culpable mental state necessary to support the award, and (3) the disloyalty of some Apache employees cannot be attributed to Apache.

In an effort to guide Texas practitioners through the murky waters of exemplary damages, our Supreme Court, in *Transportation Insurance Company v. Moriel*, 879 S.W.2d 10 (Tex.1994), explored the dichotomy between the exhortation to look at all of the surrounding facts to determine whether a defendant was grossly negligent, *Burk Royalty Co. v. Walls*, 616 S.W.2d 911, 919 (Tex. 1981), and the traditional no evidence review which constrains reviewing courts to look only at the evidence favoring the verdict. *Transportation Insurance Company v. Moriel*, 879 S.W.2d at 20. The Court ultimately resolved the conflict by its determination that the test for gross negligence contains both objective and subjective components, *id.* 879 S.W.2d at 21–22, *i.e.*, before a gross negligence finding can be sustained, the evidence must show both that the act was likely to result in serious harm, and that the defendant was consciously indifferent to the risk of harm. *Id.* at 892, 879 S.W.2d at 22–23.

---

7. We recognize, as Apache urges in contending for permanent injury to realty, that the blowout and its ensuing consequences were not subject to an injunction. *Cf. Neely v. Community Properties, Inc.*, 639 S.W.2d 452, 454 (Tex.1982) (whether damage is permanent or temporary may depend on whether an injunction would be successful). However, the possibility of a successful injunction is merely a factor to be considered in determining whether the injury is temporary or permanent, and the unavailability of a successful injunction does not necessarily change a temporary injury into a permanent one. *City of Odessa v. Bell*, 787 S.W.2d 525, 530 (Tex. App.—El Paso 1990, no writ).

Thus, our duty is to look at all of the surrounding factors attributable to the exemplary award, set forth in detail those facts which support the award, and make a determination whether there is legally sufficient evidence to support the objective and subjective components and the finding.

■ Because the jury found Apache grossly negligent, Apache has the burden of establishing there was no evidence to support the finding. *Burk Royalty Co. v. Walls*, 616 S.W.2d at 920–21. Even where there is evidence of an entire want of care and also evidence of "some care," the jury's finding of gross negligence through an entire want of care resolves the issue, and we are bound by the finding in testing for legal sufficiency. *Id.* at 921. The finding of gross negligence will be upheld if there is legally sufficient evidence that (1) the defendant's conduct created an extreme risk of harm, and (2) the defendant was aware of the extreme risk. *Wal–Mart Stores, Inc. v. Alexander*, 868 S.W.2d 322, 326 (Tex.1993).

■ In considering whether the evidence is legally insufficient, we will review the entire record to determine whether there is more than a scintilla of evidence to support the finding, *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex.1965), and if so, the finding will be upheld. *Stedman v. Georgetown S. & L. Ass'n*, 595 S.W.2d 486, 488 (Tex.1979). Evidence is merely a scintilla when it is so weak as to do nothing more than create a mere surmise or suspicion of a fact. *Seideneck v. Cal Bayreuther Associates*, 451 S.W.2d 752, 755 (Tex.1970). In evaluating legal sufficiency, we are required to determine whether the proffered evidence as a whole rises to a level which would enable reasonable and fair-minded people to differ in their conclusion. *Accord McDonough v. Zamora*, 338 S.W.2d 507, 515–16 (Tex.Civ.App.—San Antonio 1960, writ ref'd n.r.e.). If the evidence is

legally sufficient, we will not reverse the trial court's judgment.

Apache contends evidence of the actions involved did not rise to the level of gross negligence. No exact line can be drawn between negligence and gross negligence; the character of the actual act required is determined by the terms used to define "gross negligence."

Gross negligence has been defined as that entire want of care which would raise the belief that the act or omission complained of was the result of a conscious indifference to the rights or welfare of the person or persons to be affected by it. *Burk Royalty Co. v. Walls*, 616 S.W.2d at 920.[8] Gross negligence differs from ordinary negligence in that the defendant must be "consciously indifferent," and the conduct must create an extreme degree of risk. *Wal–Mart Stores, Inc. v. Alexander*, 868 S.W.2d at 326.

The requirement of an extreme degree of risk is not satisfied by a remote possibility of injury or even a high probability of minor harm, but rather, the likelihood of serious injury to the plaintiff. *Id.* In other words, only if the defendant's act or omission is unjustifiable and likely to cause serious harm can it be gross negligence. *Transportation Insurance Company v. Moriel*, 879 S.W.2d at 21–22.

■ Ordinary negligence is raised to the level of gross negligence by the mental attitude, *i.e.*, the conscious indifference, of the defendant to the rights, welfare and safety of others. *Rainbow Exp., Inc. v. Unkenholz*, 780 S.W.2d 427, 429 (Tex.App.—Texarkana 1989, writ denied). The distinguishing factor between negligence and gross negligence is the degree of risk of which the defendant was, or should have been, aware. *Williams v. Steves Industries, Inc.*, 699 S.W.2d 570, 572 (Tex.1985). The focus of our review is on the mental attitude of the company charged, and whether the acts or omissions displayed a conscious and deliberate disregard for the

---

**8.** We recognize that the most recent version of *Transportation Insurance Company v. Moriel*, revised the definition of gross negligence to correspond with the statutory definition in Texas Civil Practice & Remedies Code Annotated § 41.001(5) (Vernon Supp.1994). However, we will apply the definition of gross negligence in effect at the time of the trial of this cause, particularly since there were no confrontations concerning the definition of gross negligence at that time.

interest or safety of others. *Dyson v. Olin Corp.*, 692 S.W.2d 456, 457–58 (Tex.1985).

■ A plaintiff may prove a defendant's gross negligence by proving the defendant had actual subjective knowledge that his conduct created an extreme degree of risk. *Transportation Insurance Company v. Moriel*, 879 S.W.2d at 22–23. The evidence in the present instance shows Apache had actual knowledge that acts and omissions (in the form of kickbacks) attributable to it created an extreme degree of risk, yet, Apache consciously disregarded those risks. '

The parties differ as to the significance of the evidence that Apache knew its employees were taking kickbacks. The Moore group contends evidence of Apache's knowledge of the kickback scheme indicated Apache knew the effects of kickbacks on the quality of work on the Key 1–11 well, and knew that White Stripe did not conduct the required tests on the pipe in the well, yet allowed the pipe to be fitted down the hole. Apache contends it had no knowledge of the kickbacks on the Key 1–11 well until after the blowout, and the majority of the evidence related to kickback activities was during the time after the blowout; therefore, evidence of such activities could not have served as evidence of gross negligence in connection with the blowout.

The record reveals that Apache began investigating allegations of kickback activities as early as 1980. Although the investigations did not include the Key 1–11 well specifically, since it was not drilled until 1981, there was testimony that kickbacks were so widespread in the 1980's that men who worked in the oil patches knew of available kickbacks on Apache wells, including the Key 1–11 well, prior to taking jobs on the Key 1–11 well. Apache's former in-house counsel testified that the law presumes kickbacks affect the way people perform their jobs.

Even discounting the evidence of kickbacks, there is legally sufficient evidence from which the jury could have found gross negligence as differentiated from ordinary negligence. The record reveals that Apache management decided not to run logs or tests to determine whether the casings had been worn or damaged by the drilling out of cement following the kick. Apache knew the Key 1–11 well had a leak and,· despite contrary recommendations, decided to shut in the well without fixing the leak. Apache had actual knowledge that the relief valve needed a steady flow of nitrogen to operate properly and prevent the blowout; yet, Apache did not adequately monitor the flow to the system. Moreover, Apache put Clower in charge of the well despite knowledge of his alcohol abuse and other problems related to kickbacks, and allowed the kickback scheme to continue despite knowing, by its own admission, that such activities affected the quality of its employees' work. This evinces that Apache consciously disregarded the risks associated with the kick and the ensuing leak, circumstances which it knew were capable of causing a blowout. These circumstances passed the "extreme risk" test established in *Transportation Insurance Company v. Moriel*, 879 S.W.2d at 22–23.

Apache further contends the Moore group did not prove the requisite mental state to support the imposition of an award of exemplary damages. This is so, Apache submits, because exemplary damage awards based upon injuries to realty are available only when the evidence shows some element of fraud, malice or oppression, and the conduct of the defendant must have been actuated, or accompanied, by some evil intent or result from such gross negligence that the same may be regarded as an intentional injury. *Scurlock Oil Co. v. Joffrion*, 390 S.W.2d 526, 532 (Tex.Civ.App.—Tyler 1965, no writ).

The existence of gross negligence need not rest upon a single act or omission, but may result from a combination of negligent acts or omissions, and many circumstances and elements may be considered in determining whether an act constitutes gross negligence. *International Armament Corp. v. King*, 674 S.W.2d 413, 416–17 (Tex.App.—Corpus Christi 1984), *aff'd*, 686 S.W.2d 595 (Tex. 1985). The defendant's mental culpability can be inferred from actions and circumstances indicating a state of mind amounting to a conscious indifference. *Transportation Insurance Company v. Moriel*, 879 S.W.2d at

22–23; *Burk Royalty Co. v. Walls,* 616 S.W.2d at 912.

Augmenting the evidence that Apache failed to see that the nitrogen bottles necessary for the Axelson relief valve to operate were properly monitored, was the testimony of Tom Reames that although he was the Apache company man responsible for checking the well, he was not instructed as to what valve to check, how to check it, or when to check it, nor was he in fact instructed to check the valve. He rarely went by the well and "never" checked on the nitrogen bottles and would not have known what he was looking for had he checked them. Carmen Neece testified that Reames in fact did not always check the site and falsified his daily reports with the pressures he checked days before.

The jury could have inferred from this evidence that Apache consciously disregarded the safety of the well since it knew the flow of nitrogen was necessary to maintain the relief valve to prevent a blowout. Stated differently, Apache made a decision, in the face of impending harm, not to care about the consequences of its actions which might have, and ultimately did, lead to that harm. *Williams v. Steves Industries, Inc.,* 699 S.W.2d at 573.

Third, Apache submits that the disloyalty of a few of its employees cannot be attributed to the company so as to sustain the award of exemplary damages against it. In support of this contention, Apache relies upon the holding in *Fort Worth Elevators Co. v. Russell,* 123 Tex. 128, 70 S.W.2d 397 (1934),[9] that exemplary damages may not be assessed against a corporation on a theory of respondeat superior.

■ The rule set forth in *Russell* provides that the default for which exemplary damages may be recovered must be that of the corporation; the grossly negligent act must be the very act of the corporation itself or, if the act is that of a mere servant or employee, then it must have been previously authorized, or subsequently must be approved, by the corporation. *Id.,* 70 S.W.2d at 406. In order to impose exemplary damages on a corporation for acts of its agents, there must be evidence not only that the actor was an employee, but also that the agent was a vice-principal employed in a managerial capacity or that the agent was performing an act authorized by the principal or managerial agent, or that the principal ratified or approved the act of the agent. *Id.*

Tate was the company man charged with the responsibility of maintaining the hookups and pumpers. The jury was entitled to determine from the evidence that Tate was engaged in the performance of nondelegable or absolute duties of Apache, and was a vice-principal of Apache as a matter of law. *Rainbow Exp., Inc. v. Unkenholz,* 780 S.W.2d at 432.

Reames testified that although Tate told him to check the Key 1–11 well, he did not tell him to check the pressure valves, only to check for stolen property. While Reames made notations of the tubing pressures, he was not required to report his readings to anyone. He further testified that he would not have known whether the readings were safe pressures since Tate did not tell him to check the valve, or for what he was to check.

We see no difference in this situation and that in *Burk Royalty,* where the acts and omissions of negligence and gross negligence ultimately rested in the acts and decisions of a vice-principal of the company who delegated responsibilities to other employees, and our Supreme Court upheld the finding of gross negligence against the company. 616 S.W.2d at 922–24. Resultingly, there was legally sufficient evidence by which the jury could have attributed the actions of Apache's employees to the company. Apache's second point of error is overruled.

■ By its fifth point of error, Apache contends the trial court's failure to instruct the jury to consider the gross negligence of specific employees was reversible error because it permitted the jury to punish Apache for conduct it did not commit, sanction, or

**9.** An unrelated portion of *Russell* was disapproved in *Wright v. Gifford–Hill & Co., Inc.,* 725 S.W.2d 712, 714 (Tex.1987).

ratify. The basis for, and the only citation in support of, this contention is Apache's reliance upon the wording of Texas Pattern Jury Charges §§ 6.14 and 6.15. Although the Texas Pattern Jury Charges are an excellent aid and guide in formulating jury issues and instruction, they are not intended to state the only appropriate language on a given issue. *Murphy v. Waldrip*, 692 S.W.2d 584, 592 (Tex.App.—Fort Worth 1985, writ ref'd n.r.e.).

■ Contrary to Apache's contention, corporations may be held liable without a specific request for a finding that an individual was grossly negligent. *See e.g., International Armament Corp. v. King*, 674 S.W.2d 413 (Tex.App.—Corpus Christi 1984), *aff'd*, 686 S.W.2d 595 (Tex.1985); *Ford Motor Co. v. Nowak*, 638 S.W.2d 582 (Tex.App.—Corpus Christi 1982, writ ref'd n.r.e.); and *Rawlings Sporting Goods Co. v. Daniels*, 619 S.W.2d 435 (Tex.Civ.App.—Waco 1981, writ ref'd n.r.e.). Where a situation does not involve the negligence or intentional act of an employee whose conduct was ratified by company management, but involves complex company policy decisions made by company management, it is proper to hold the company actionable for gross negligence. *Accord Monsanto Co. v. Johnson*, 675 S.W.2d 305, 310 (Tex.App.—Houston [1st Dist.] 1984), *writ ref'd n.r.e.*, 696 S.W.2d 558 (Tex.1985).

The evidence supported a reasonable inference by the jury that Apache management had actual knowledge of the inherent dangers of shutting in a well with a leak. Still, Apache opted to do so. Additionally, Apache knew how to correct the situation without shutting in the leak, but chose not to do so. Apache had knowledge that kickbacks were prevalent on all of their wells and, although they knew kickbacks affected the way people performed their jobs and had launched an investigation into the activities, they failed to take any action to correct the situation, or to place people in charge who were not taking kickbacks or using drugs or alcohol on the job. Such evidence provided a sufficient basis for the jury's conclusion of conscious indifference and the finding of gross negligence against Apache.

As a consequence, the trial court's failure to instruct the jury to consider the gross negligence of individual employees was not error. Apache's fifth point of error is overruled.

By its third point of error, Apache challenges the constitutionality of the exemplary damage award on three grounds. The grounds are that (1) the award was unconstitutional under both the Texas and United States Constitutions because the trial court did not guide the jury in determining the kind of extreme conduct that justifies an award of exemplary damages, thereby denying Apache due process; (2) the award violates both constitutions because it bears no reasonable relationship to the amount of actual damages or severity of the offense; and (3) the award amounts to an excessive fine under the Texas Constitution.

■ Apache's first challenge, that the trial court did not properly guide the jury in the determination of exemplary damages, is a complaint against the submission of the issue. After a lengthy examination of the voluminous record before us, we have determined nothing has been preserved for our review since Apache did not articulate this complaint to the trial court. *Allen v. American National Insurance Company*, 380 S.W.2d 604, 609 (Tex.1964).

All objections not made to the jury charge before it is read to the jury are waived. Tex.R.Civ.P. 272. The objection must point out distinctly the objectionable matter and the grounds therefor. Tex.R.Civ.P. 274.

In its Reply Brief, Apache directs our attention to a portion of the statement of facts (pages 4233–37), which it alleges addresses its constitutional objections. We have read those pages, as well as the other 5000 plus pages of the statement of facts, and we do not agree that the constitutionality of the submission was specifically challenged on the grounds presented by this appeal. The objection was voiced as:

> Third, Your Honor, this issue is objectionable because it is unconstitutional. This issue, as worded, encourages exemplary damages to be awarded as compensation. This statement just unabashedly ignores

the only constitutional underpinning for punitive damages; i.e., to deter conduct by punishing the defendant. The current wording of this issue is the part one, where it states: Other than as compensation for attorneys' fees, encourages an award for compensation, which is improper.

Although Apache voiced its complaint against the submission of the exemplary damage issue, the objection was that it encouraged damages to be awarded as compensation, not, as presented on appeal, that the trial court failed to list certain factors to guide the jury in its determination.[10] Failing to point out to the trial court distinctly the objection raised on appeal, Apache has waived any error. *Castleberry v. Branscum*, 721 S.W.2d 270, 276 (Tex.1986). Apache had the responsibility of making the trial court aware of its complaint timely and plainly. *State Dept. of Highways v. Payne*, 838 S.W.2d 235, 241 (Tex.1992). Failing to do so, Apache has not preserved its complaint for our review. Tex. R.App.P. 52(a).

■■■■ Apache's next constitutional challenge to the award is that it bears no reasonable relationship to the amount of actual damages or the severity of the offense. While an award of exemplary damages must bear an understandable and reasonable relationship to the actual damage award and the nature of the defendant's conduct, *Alamo Nat. Bank v. Kraus*, 616 S.W.2d 908, 910 (Tex.1981), the reasonable proportion rule does not, standing alone, serve to fix a particular ratio. *Tatum v. Preston Carter Co.*, 702 S.W.2d 186, 188 (Tex.1986). Each particular case must be reviewed on its own facts.

■■■■ The amount of exemplary damages to be awarded is uniquely within the jury's discretion, *Goswami v. Thetford*, 829 S.W.2d 317, 321 (Tex.App.—El Paso 1992, writ denied), and the process has no express

standards. *State Farm Mut. Auto. Ins. Co. v. Zubiate*, 808 S.W.2d 590, 606 (Tex.App.—El Paso 1991, writ denied) (Osborn, C.J., concurring). Unless the size of the award and the circumstances of the case indicate the award was the result of passion or prejudice, or that the evidence has been disregarded by the jury, the verdict is conclusive and should not be set aside either by the trial or appellate court. *Donnel v. Lara*, 703 S.W.2d 257, 262 (Tex.App.—San Antonio 1985, writ ref'd n.r.e.).

■■■■ It is evident there is no bright line mathematical formula upon which to calculate ratios between actual and exemplary damages. *Pacific Mutual Life Insurance Company v. Haslip*, 499 U.S. 1, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991). In conducting our review to determine the reasonableness of the award, we must bear in mind the guiding factors set forth in *Kraus*, which include: (1) the nature of the wrong; (2) the character of the conduct involved; (3) the degree of culpability of the wrongdoer; (4) the situation and sensibilities of the parties concerned; and (5) the extent to which such conduct offends a public sense of justice and propriety. 616 S.W.2d at 910.

The nature and character of the wrong were shown by Apache's lack of diligence in preventing, or attempting to prevent, a known kickback scheme, thereby allowing inspections to be invoiced when there was no certainty they were performed, and allowing the pervasive use of kickbacks in the forms of drugs, alcohol and prostitutes to affect operations on the Key 1–11 well. Apache argues that the nature of the wrong was the Moore group's economic loss, and exemplary damages in large ratios to pure economic losses are improper. This argument is negated by the United States Supreme Court's

---

10. Apache's appellate contention is that the factors outlined in *Alamo Nat. Bank v. Kraus*, 616 S.W.2d 908, 910 (Tex.1981), should have been included in the submission. Those factors are for appellate consideration in determining whether the amount of exemplary damages was reasonable, 863 S.W.2d 210, 218 (Tex.App.—Houston [14th Dist.] 1993, no writ); *K–Mart Corp v. Pearson on Behalf of Ramos*, 818 S.W.2d 410, 416 (Tex.App.—Houston [1st Dist.] 1991, no writ), and *may* be included in jury submissions.

*State Farm Mut. Auto. Ins. Co. v. Zubiate*, 808 S.W.2d 590, 603 (Tex.App.—El Paso 1991, writ denied). Prior to *Transportation*, which we have determined to be proactive only, there was no authority for Apache's position that those factors *must* be included in the submission of the issue to the jury. *Cf.* 879 S.W.2d at 29 n. 26 (footnote states that Texas jurors are instructed on the factors in *Kraus*, intimating it is the practice of trial courts to so instruct, though this is not necessarily so).

upholding of an award of exemplary damages awarded on purely economical actual damages at a ratio of 526 to 1. *TXO Production Corp. v. Alliance Resources Corp.*, 509 U.S. ——, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993). Moreover, an act or omission that creates great peril but results only in minor injury may be grossly negligent, *Transportation Insurance Company v. Moriel*, 879 S.W.2d at 21–22, and the blowout presented the possibility of great danger and the loss of human life had someone been present on the well at the time of the blowout.

The vice-principals of Apache, including Clower, Snapp, Tate and Storts knew kickbacks were prevalent, and there was evidence that each of these men participated to some degree in the kickback scheme, making Apache culpable for the activities on the Key 1–11 well. *Rainbow Exp., Inc. v. Unkenholz*, 780 S.W.2d at 432. Additionally, Apache failed to monitor the well after shutting it in with pressure on the backside. There was ample evidence that Apache was aware the well was under-manned, that "Apache had too many well operations and not enough people—people that weren't taking care of their job," and that the operation of the Key 1–11 well was "poorly supervised in the field." Finally, the deportment of Apache's company men on the Key 1–11 well, as shown by the evidence, could have been viewed by the jury as offensive to the public's sense of propriety.

In applying the factors set forth in *Kraus* to the facts and circumstances of this case, we have viewed the evidence in the light most favorable to the jury's verdict. *Chemical Express v. Cole*, 342 S.W.2d 773, 780 (Tex.Civ.App.—Dallas 1961, writ ref'd n.r.e.). In light of this application, the jury's award was not a baseless award.

In consideration of Apache's contention that its calculated ratios of exemplary to actual damages, 208 to 1 each for Leo Moore and Daisy Moore, and 104 to 1 for Bess Cole, are disproportionate, we have reviewed precedential cases discussing acceptable ratios. Our research has revealed that Texas courts have approved ratios of exemplary to actual damages ranging from 3 to 1, *Bank of North America v. Bell*, 493 S.W.2d 633, 636 (Tex. Civ.App.—Houston [14th Dist.] 1973, no writ); 19 to 1, *Goswami v. Thetford*, 829 S.W.2d at 321; 28 to 1, *Beacon Nat. Ins. Co. v. Reynolds*, 799 S.W.2d 390, 398 (Tex.App.— Fort Worth 1990, writ denied); to 2,250 to 1, *Donnel v. Lara*, 703 S.W.2d at 261–62. These holdings and others of like ilk, coupled with the United States Supreme Court's holding in *TXO Production Corp. v. Alliance Resources Corp.*, approving a ratio of exemplary to actual damages of 526 to 1, support our determination that the awards of exemplary damages which relate to actual damages at ratios of 208 to 1 and 104 to 1 are not unreasonable.[11]

Our Texas Legislature, in an attempt to regulate exemplary to actual damages ratios, enacted a statute to limit the amount of exemplary damages to four times the amount of actual damages or $200,000, whichever is greater. Tex.Civ.Prac. & Rem.Code Ann. § 41.007 (Vernon Supp.1994). However, the applicability of the statute is limited to causes of action defined by section 33.001 of the Texas Civil Practice & Remedies Code, entitled "Comparative Responsibility." Tex. Civ.Prac. & Rem.Code Ann. § 41.002(a) (Vernon Supp.1994). Because the present action does not fall within the scheme of the statute, the statute does not supersede the Moore group's recovery. *Transfer Products, Inc. v. Texpar Energy, Inc.*, 788 S.W.2d 713, 717 (Tex.App.—Corpus Christi 1990, no writ).

---

**11.** It has been suggested that the required ratio of exemplary to actual damages is unnecessary. James T. Foley, *Required Ratio of Actual to Exemplary Damage*, 25 Baylor L.Rev. 127, 134 (1973). In light of the application the courts have made of the requirement, it would appear that the courts, at least in application, agree. Even the United States Supreme Court has declined to employ an approach that focuses entirely on the relationship between actual and exemplary damages. *TXO Production Corp. v. Alliance Resources Corp.*, 509 U.S. ——, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993). Because the exact ratio is not necessary to our determination regarding excessiveness, we do not address the correct method of calculating ratios as presented by the Moore group.

■ Apache next contends that the award of exemplary damages amounts to an excessive fine, violative of the Excessive Fines Clause of the Texas Constitution article I, § 13. The contention is premised upon the interpretation in *Pennington v. Singleton*, 606 S.W.2d 682 (Tex.1980), that the clause includes civil penalties. *Id.* at 690; *and see State Farm Mut. Auto. Ins. Co. v. Zubiate*, 808 S.W.2d at 604–05.

Since the interpretation of the clause in *Pennington*, the United States Supreme Court has interpreted the federal counterpart of our article I, § 13, *supra*, to be inapplicable to exemplary damage awards between private parties. *Browning–Ferris Industries of Vermont, Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 109 S.Ct. 2909, 106 L.Ed.2d 219 (1989). We agree with the reasoning of the Court in *Browning–Ferris*, and believe that the excessive fines clause of the Texas Constitution is not applicable to the present award of exemplary damages since there is no state action involved. *Celotex Corp. v. Tate*, 797 S.W.2d 197, 208 (Tex. App.—Corpus Christi 1990, no writ).

Nevertheless, we have reviewed the potential excessiveness of the award in light of the clause, bearing in mind the primary consideration whether the fine was fixed with reference to the objective it was to accomplish, *Pennington v. Singleton*, 606 S.W.2d at 690, and focusing on Apache's conduct. *Corporate Wings, Inc. v. King*, 767 S.W.2d 485, 489 (Tex.App.—Dallas 1989, no writ). The object here to be accomplished was to deter Apache and others similarly situated from the same kind of conduct made the basis of this suit, to punish Apache for its gross negligence, *State Farm Mut. Auto. Ins. Co. v. Zubiate*, 808 S.W.2d at 605, and to deter Apache from encouraging or failing to discourage employee behavior. *Borden Inc. v. Rios*, 850 S.W.2d 821, 829 (Tex.App.—Corpus Christi 1993, no writ). These objectives are evidenced by the conditional submission of the charge on these issues in the present instance.

The constitution requires that exemplary damages not be grossly excessive, but it does not require such an award to be ineffectual and impotent. *Eichenseer v. Reserve Life Ins. Co.*, 934 F.2d 1377, 1383 (5th Cir.1991). Consequently, the net worth of the defendant is relevant in examining the excessiveness of such an award. *Lunsford v. Morris*, 746 S.W.2d 471 (Tex.1988).

The parties stipulated Apache's net worth was an estimated $439,000,000; thus, the $4,500,000 exemplary damage award constituted approximately 1% of Apache's net worth. We have determined that such an award was not excessive considering the attending circumstances previously outlined. The penalty imposed bore a direct relationship to the purposes of the imposition of the fine and was not excessive. Apache's third point of error is overruled.

■ Depicted in six sub-points, Apache contends by its fourth point of error that even if exemplary damages are justified, the trial court erred in failing to remit the excessive amount awarded. We have previously determined the award was not excessive, pretermitting our address of this issue. Even so, remittitur is only appropriate when the evidence is insufficient to support the verdict. *Pope v. Moore*, 711 S.W.2d 622, 624 (Tex. 1986). If the evidence is factually sufficient to support a jury award of any amount, the court has no authority to suggest a remittitur, no matter how manifestly unjust or shocking to the conscience of the court the amount of the award may be. *City of La Porte v. Prince*, 851 S.W.2d 876, 883 (Tex. App.—Waco 1993, writ granted).

■ Because the amount of exemplary damages is uniquely within the jury's discretion, *Goswami v. Thetford*, 829 S.W.2d at 321, there is, by necessity, little evidence of a dollar amount upon which the jury can rely. When a jury honestly tries to set an amount to punish a wrongdoer that does not oppress him, but which is great enough to keep him and others similarly situated from committing similar acts, the judgment should not be disturbed by the appellate courts. *Aetna Cas. and Sur. Co. v. Joseph*, 769 S.W.2d 603, 608 (Tex.App.—Dallas 1989, no writ).

■ In determining factual insufficiency, we consider and weigh all of the evidence, including any evidence contrary to the trial court's judgment. *Pool v. Ford Motor Co.*,

715 S.W.2d 629, 635 (Tex.1986). In so doing, it is not within our province to second guess the jury unless only one inference could be drawn from the evidence. *State v. $11,-014.00*, 820 S.W.2d 783, 785 (Tex.1991).

The evidence previously outlined is legally sufficient for the jury to have found exemplary damages. Moreover, we have determined that this evidence was sufficient to support the award and the award was not excessive or unreasonable under the circumstances. Based upon our prior determinations, we overrule Apache's fourth point of error in its entirety.

■ By the sixth point of error, Apache contends the separate submission of exemplary damages attributable to attorney's fees was reversible error. If so, the harm can be corrected by modification of the judgment in regard to Apache's contention that the Moore group was not entitled to attorney's fees. Tex.R.App.P. 90.

The jury awarded $4,000,000 as exemplary damages excluding attorney's fees, and $500,-000 as exemplary damages attributable to attorney's fees, all to be divided equally among the eight plaintiff-intervenors remaining at trial. By its judgment, the trial court awarded the Moore group $1,687,500 in exemplary damages, which award included their individual portions of 12.5% of the $500,000 attributable to attorney's fees.

Although it is established that compensation for attorney's fees may be recovered as part of exemplary damages, *Hofer v. Lavender*, 679 S.W.2d 470, 474 (Tex.1984); *Planet Plows, Inc. v. Evans*, 600 S.W.2d 874, 877 (Tex.Civ.App.—Amarillo 1980, no writ), it is unnecessary for us to decide whether, in this cause, it was appropriate to separate that element in the submission of the issue to the jury. This is so, because in this cause, Daisy Moore acted pro se and, although Leo Moore and Bess Cole were represented by an attorney, there was no evidence of the amount of attorney's fees, if any, paid by them to serve as the basis for their compensation.

Raymond Doak Bishop, an attorney for a law firm representing the Scott group in the past, testified to the amount of attorney's fees expended by the Scott group, but neither he, nor anyone else, testified to any attorney's fees incurred by Leo Moore and Bess Cole. Because there was no evidence of any attorney's fees paid or incurred by Leo Moore and Bess Cole, we modify the judgment to delete the award for attorney's fees from their recovery of exemplary damages.

■ Daisy Moore acted pro se throughout the proceedings and, as a consequence, incurred no attorney's fees. She is not entitled to compensation for time lost due to litigation, *Shenandoah Assoc. v. J & K Properties*, 741 S.W.2d 470, 487 (Tex.App.—Dallas 1987, writ denied), and she is not entitled to recovery of attorney's fees for acting on her own behalf. *See Beasley v. Peters*, 870 S.W.2d 191 (Tex.App.—Amarillo 1994, n.w.h.). We modify the judgment to delete the award for attorney's fees from her recovery of exemplary damages. To this extent, Apache's sixth point of error is sustained; otherwise it is overruled.

■ By its final point of error, Apache contends the trial court erred in allowing an expert, designated only by Leo Moore and Bess Cole, to testify on behalf of Daisy Moore. In support of this contention, Apache directs our attention to "Daisy Moore's Answers to Interrogatories," found in the transcript.

We have reviewed Daisy Moore's responses, in which she identifies and responds to interrogatory numbers 5, 7, 14, 15, and 18, none of which ask for a designation of experts. A complete set of the interrogatories sent to Mrs. Moore is not found in the record, and there is nothing in the record to indicate the omitted interrogatories made inquiry regarding expert witnesses.

It is appellant's burden to present a record sufficient to show the error contended to require reversal. Tex.R.App.P. 50(d); *Pyles v. United Services Auto. Ass'n*, 804 S.W.2d 163, 164 (Tex.App.—Houston [14th Dist.] 1991, writ denied). Because Apache failed to present a record showing the error complained of, its contention has not been preserved for our review. *Rossen v. Rossen*, 792 S.W.2d 277, 278 (Tex.App.—Houston [1st

Dist.] 1990, no writ). Apache's seventh point of error is overruled.

Accordingly, the judgment of the trial court is modified to delete the recovery by the Moore group, and each member thereof, the portion of attorney's fees awarded them by the jury and, as modified, is affirmed.

### ON MOTION FOR REHEARING

By its motion for rehearing, Apache alleges that our original opinion contained numerous factual inaccuracies and mischaracterizations of the evidence. While we remain convinced that our original disposition of Apache's appeal is correct, we concede, in regard to its factual inaccuracy claim, that our recording, in paragraph eleven of the opinion, of events in June and the following February, showed, by typographical mischance, the year 1992 for the June events and the year 1993 for the February events, whereas the correct years were 1982 and 1983, respectively. We, therefore, readily amend the eleventh paragraph to reflect that the June events were in 1982 and the February events were in 1983.

Upon analysis, Apache's evidentiary complaints are centered on what it characterizes in its motion as this Court's findings made from the evidence. It suffices to state that the perceived findings are merely recitations of the facts culled from a voluminous evidential record, marshalled in response to Apache's complaints of insufficient evidence, and determined to be sufficient bases for the jury's findings of fact. Consequently, the varying interpretations of the evidence need not be again addressed; but, in this connection, we observe that Apache's associated complaints that we erred in our application of the law to the facts are virtually the same complaints made on original submission, and we deem they were given full attention in our original opinion.

Parenthetically, we note that since the writing of our original opinion, it has come to our attention that the judgments rendered in *Heil–Quaker Corp. v. Mischer Corp.*, 863 S.W.2d 210 (Tex.App.—Houston [14th Dist.] 1993), cited, with a "no writ" history, in marginal note 10 of our opinion,

and in *Borden Inc. v. Rios*, 850 S.W.2d 821 (Tex.App.—Corpus Christi 1993), cited, with a "no writ" history, late in our opinion during the address of Apache's third-point challenge to the constitutionality of the exemplary damage award, have been set aside pursuant to settlement agreements. Because the judgments were set aside "without reference to the merits," *Mischer Corp. v. Heil–Quaker Corp.*, 877 S.W.2d 300, (Tex.1994); *Borden, Inc. v. Rios*, 859 S.W.2d 70 (Tex.1993), their stature as stare decisis is equivalent to a writ dismissed case, and their opinions remain valid support for the propositions for which they were cited in the original opinion. *Houston Cable v. Inwood West Civic Ass'n*, 860 S.W.2d 72, 73 (Tex.1993).

Aside from these corrections, Apache's motion for rehearing is overruled.